WILKINS, District Judge. I regret the necessity of condemning the Fame, but the statute is imperative. The first count is based upon the 1st section of the act of 1821, and the facts clearly establish a violation of its provisions. The Fame sailed from the port of Amherstburg, in Canada, bound for Detroit, with 200 barrels of whisky, ten kegs of gin and five of brandy, all of Canadian manufacture, and failed to deliver her manifest to the collector at Detroit, where the nearest customs office was located. The excuse is that the liquors were not intended to be imported into the United States, but were designed to be transhipped into another vessel bound to a Canadian port. Of this intention I have no doubt; yet the master was bound to deliver his manifest when lying at or off the port. Such merchandise was subject to duty, had an importation been intended, and from the "Report Outwards," signed and verified by the master at Amherstburg, it appears the vessel was consigned to Detroit. As no other destination is mentioned for the liquors, they must be presumed to have been consigned to the same place. Foreign liquors are subject to duty; and although this freight was clearly intended elsewhere, yet such intention proved by oral testimony, contrary to the ship's papers, cannot be admitted as an excuse for a palpable violation of the statute. It would open the door to a vast amount of fraud upon the revenue.

But had I any doubt as to the 1st count, the second is sustained beyond all question. The cargo is of greater value than $400, and the proofs establish the fact that she was unladened within the United States, at midnight, without license or permit. I say unladened, for the steamer Ploughboy was lying at the dock at Port Huron, where the Fame transhipped her cargo. It is contended that this transhipment is not an unlading within the meaning and spirit of the 50th section of the act of 1799. It is true the cargo was not landed in the literal sense of the word—i. e., placed on shore—but it was taken from one vessel to the other while both were in port. This was clearly a landing within the intent of the statute, which was designed to prevent frauds upon the revenue. It was easy for the master to procure a permit, and thus save his owners from this prosecution. But the court cannot make the law bend to the convenience of masters. Decree of condemnation.

## Case No. 4,634.

### The FAME.

[3 Mason, 147.] [1]

Circuit Court, D. Maine. Oct. Term, 1822.

[1] [Reported by William P. Mason, Esq.]

Shepley, for the United States,

Mr. Longfellow, for claimants,

The cause was continued for advisement to the next October term, and at that term the following opinion, in substance, was delivered by the court:

STORY, Circuit Justice. The general principle in relation to the rights of a nation to rivers and bays, of which it has an exclusive and prior occupancy, is laid down by Vattel and Martens in the passages cited at the bar, need not be disputed. Whether there has been, in point of fact, such an exclusive occupancy, is often a matter of great difficulty to ascertain. The nature, breadth, and extent of a river or bay, and the necessity of its constant use, in all parts, for purposes of trade and navigation, by the nations inhabiting the opposite banks must, in many cases, repel the supposition of an exclusive right. Where no such exclusive right exists, the general principle of the law of nations, as deduced from the authorities, is, that each nation has a right to go to the middle of the stream, calculated from low water mark, as the limit of its territorial boundary. This doctrine has been affirmed by the supreme court in the case of Handly's Lessee v. Anthony, 5 Wheat. [18 U. S.] 374. But although the territorial line of a nation, for purposes of absolute jurisdiction, may not extend beyond the middle of the stream; yet, consistently with this doctrine, the right to the use of the whole river or bay for the purpose of navigation, trade, and passage, may be common to both nations. Such a right does not destroy the territorial jurisdiction to the middle of the stream; but it is in the nature of an easement as it is called at the common law, or a servitude, as it is called in civil law. It is like the right of a highway, or private way, over the land of another. This right of passage and navigation must exist, as a common right in all those cases, where such passage or navigation is ordinarily used by both nations, and is indispensable for their common convenience, and access to their own shores. A river or bay may be so narrow, or irregular, or so liable to difficulties from winds, waves, and currents, that it cannot be navigated by either nation without the necessity of the right of passing over the whole waters at all times. If, in such a case no exclusive right is recognized in either nation, the constant use by both is conclusive proof of a common right of passage and navigation in both. These are all the principles which I think it necessary to bring into review on this occasion, so far as the case stands upon the general law of nations.

There is no pretence to say, that Great Britain had, as to us, acquired, previously to the revolution, any exclusive right to the waters of Passamaquoddy bay. These waters were common to all the subjects of the realm; and just as much a part of our right and inheritance, as of any other of the British dominions. The American colonies used them on all occasions; and the province of Massachusetts, which was contiguous to the bay, and perpetually used the waters for the purpose of navigation, and trade, and passage, might just as well be deemed the proprietor, as the province of New Brunswick, or as the realm of England. In truth, the law of nations must, under such circumstances, be presumed silently to prevail, and annex the bay to the middle of the stream, to the territories of the adjacent provinces;—and as there was at all times a common right of passage and navigation exercised over the whole bay, and it was necessary for the convenience of all parties, the whole waters must be deemed common for these purposes. When the separation took place by the American Revolution and the treaty of peace, if nothing was stipulated on either side, the status ante bellum prevailed, and there was a continuance of the old rights and privileges.

The treaty of peace of 1783 contains nothing definite on this subject. It fixes generally the eastern boundary line of the United

States on the Bay of Fundy, of which Passamaquoddy bay is part; but it is silent as to the exact line, and the use of the waters. No subsequent treaty has changed or in any shape regulated the general rights growing out of the law of nations on this subject; and therefore, as I conceive, they remain in full force. In the negotiations which have taken place between the governments of Great Britain and the United States, as to this boundary, and which ended in conventions, which, though not ratified, are not understood to have involved any real difference of opinion on this particular point, the view taken by both governments seems entirely in harmony with that of this court. The conventions of 1803 and 1807, take the middle of the channel between the islands belonging to the respective nations, to be the true and proper line.[3] This is the same rule which results from the general law of nations.

As to the line agreed upon by the collectors, it cannot for a moment be admitted as of any validity. They were not public agents intrusted with such negotiations; and their acts are not to be construed as indicating the sense of either government.

Upon the whole, my opinion is, that the Fame, being within the jurisdictional waters of the United States, and on this side of the middle of the channel, when she committed the illicit acts for which condemnation is sought, is brought within the forfeiture. Decree of condemnation accordingly.

## Case No. 4,635.

The FANITA.

[8 Ben. 11.][1]

District Court, S. D. New York. Feb., 1875.[2]

[3] See 8 Wait, St. Pap. 387–394; 10 Wait, Confid. St. Pap. p. 470.

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Modified in Case No. 4,636.]

W. R. Beebe, for libellant.
J. E. Parsons, for claimants.

BLATCHFORD, District Judge. This libel is filed by the owner of the schooner Samuel G. Miles, against the steamship Fanita, to recover for the damages sustained by the libellant through a collision which occurred between the two vessels in the East river, between New York and Brooklyn, at about 9 o'clock, p. m., on the 20th of August, 1870. The schooner had come around the Battery, and was bound to Williamsburgh, with a cargo of brick. The steamship was a propeller of 434 tons burden, and was bound down the river on a voyage to Philadelphia. The wind was north west to west north west, and the schooner was sailing up with her booms off to starboard. The tide was ebb. The stem of the propeller struck the starboard bow of the schooner between her forechains and her stem. The wound went in as far as the forehatch of the schooner, a distance of about fourteen feet, in a direction towards the port quarter of the schooner, and on a line which, if continued, would have reached to a point on the port side about ten feet forward of the stern of the schooner. The schooner sank immediately, in from 40 to 45 feet of water.

The libel alleges that the schooner had all