THE STEAMBOAT MAGNOLIA v. CHARLES K. MARSHALL.—
No. 9258.

SAME v. SAME.—No. 9259.

1. LAW OF NATIONS: FREEDOM OF THE SEAS.—The sea and its arms, by the law of nature and of nations, are common to all mankind, and are not the subject of exclusive appropriation by any nation; except only such bays, sounds, or other arms of the sea, lying wholly within the territory of a nation, whose outlets into the main ocean are so narrow as to be capable of being defended.

2. SAME: SAME: SEA-SHORE: OWNERSHIP OF: RIGHT OF NAVIGATORS IN.— The shores of the sea between the lines of high and low water belong to the adjacent nation, and are subject to its jurisdiction; yet they are subject to an easement in favor of the citizens of all nations, which entitles them to the innocent use of the sea-shore for the purposes of navigation and commerce.

3. SAME: SAME: GRANTS BOUNDED BY SEA: HOW CONSTRUED AS TO BOUND-ARY.—The common law of England, in favor of intercourse and commerce among mankind, construed grants made by the crown, of land bounded on the sea or its arms, to extend only to high water mark, leaving the right to the shore in the king for the public benefit, and to promote intercourse and commerce with other nations, by securing to them its free and innocent enjoyment.

4. NAVIGABLE RIVER: MEANING OF THE TERM.—The term "navigable," by the common law, had reference only to such waters as were by the law of

nations free to the commerce and navigation of all nations, and not to the capacity of a river or other stream for navigation; and hence "navigable river" means only that part of a fresh-water stream debouching into the sea, in which the tide ebbs and flows.

5. SAME: FRESH-WATER RIVERS: RIGHTS OF RIPARIAN OWNER AND PUBLIC IN.—The rules of the common law, which secured the property of the shores of the sea and of navigable rivers in the crown for the public, were never applied to fresh-water streams, though in fact capable of navigation. The soil under these streams belonged to the riparian proprietors, and not to the crown ; this right, however, is subject to an easement in the public to navigate such streams as were in fact navigable.

6. SAME: SAME: GRANT CONVEYS *ad usque ad filum.* A grant of land, bounded "by" or "on" a fresh-water stream, whether in fact capable of navigation or not, conveys the soil *ad usque medium filum aquæ*, and of course conveys to the grantee the shore between high and low water mark.

7. SAME: SAME: NAVIGATOR CANNOT LAND ON, OR THE PUBLIC APPROACH STREAM OVER.—The right in the public to navigate a fresh-water stream capable of navigation, does not deprive the owner of the shore between high and low water mark of his exclusive right and dominion over it, nor secure to the navigator the right to land his vessel and use the shore for the purpose of taking on or discharging a cargo ; nor does it secure the public the right to approach the stream over the land of the riparian proprietor against his consent.

8. SAME: SAME: RIGHT OF RIPARIAN PROPRIETOR TO CHARGE FOR USE OF SHORE.—The owner of the shore of a fresh-water river, capable of navigation, has the right to charge such sums as he sees proper, to navigators, for using the shore in lading and unlading their vessels, if he give notice of his charge before such use is made of his property.

9. SAME: MISSISSIPPI RIVER NOT A NAVIGABLE RIVER.—The Mississippi river is not, above tide-water, a navigable stream, in the technical sense of that term, and is in all respects subject to the rules of the common law regulating the rights of the public and of riparian proprietors in fresh-water streams capable of being navigated.

10. SAME: AUTHORITIES CITED.—The authorities, both English and American, in relation to navigable streams and fresh-water streams capable of being navigated, and to the rights of the public and the riparian proprietors, collected and reviewed in this case.

ERROR to the Circuit Court of Warren county.   Hon. J. S. Yerger, judge.

*A. Burwell,* for plaintiff in error.

No memorandum of counsel for plaintiff has come to the possession of the reporter.

*Marshall* and *Miller*, for defendant in error.

Counsel for plaintiff in error insist on a reversal of the judgment below, because the account sued on was unreasonable, and there is no proof in the record to sustain it. Before answering this view we would remark, that it was neither presented nor urged in the Circuit Court. The counsel who represented the defendant in that court, not the same who appear here, conceded that if plaintiff had the right to recover at all, he ought to recover the whole amount of his account. The controversy was not as to whether the sum demanded was reasonable, but whether plaintiff had a legal right to claim any thing. But we think counsel misapprehended the facts when they say there is no evidence in the record to sustain the judgment for the amount of the account sued for. It was admitted that plaintiff had given public notice of the terms upon which his landing might be used by steamboats, that his account for wharfage was presented to the defendant for payment *each trip*, and that he *collected* from *other* steamboats the *same rate* of wharfage charged defendant. It thus appears that the charges in this account were the usual and customary rates paid by other boats, thereby entitling plaintiff to recover even in the absence of an express contract; but it further appears that plaintiff's terms were known to and understood by defendant. Every trip the account for wharfage was actually presented, and payment thereof demanded of defendant. By using his landing, knowing the terms upon which plaintiff permitted it to be used, defendant contracted to pay him the amount he was entitled to according to those terms.

2. It certainly cannot be necessary to reply to that portion of the argument of counsel which denies plaintiff's right to recover because he is endeavoring to collect a *tonnage* duty, in violation of the Act of Congress. Nor to so much of it as has reference to the rights of defendant to navigate the Mississippi river, in pursuance of the Acts of Congress regulating vessels employed in the coasting trade. Those Acts so clearly have no bearing on this case, that we will not say one word in regard to them.

3. There is, as we believe, but one question presented by the

record; and that is, whether steamboats navigating the Mississippi river have the right to use the banks between high and low water mark, which have been graded by the riparian proprietor at his own expense for their accommodation, without making him any compensation therefor.   And we insist that it is not now an open question in this State.   It was settled by this court years ago, in the case of *Morgan & Harrison* v. *Reading*, 3 S. & M. 366.   That case was elaborately argued by counsel, and carefully and fully examined by the court; and the right of the riparian proprietor of the precise same landing now in controversy, to charge boats wharfage for using the banks of the river in front of his lots, clearly and unequivocally sustained.   Defendant in error rests upon that decision.   He purchased this identical property, the right to which was then determined, upon the faith of it.   And this court is now asked to say to a citizen who has invested his money in the purchase of real property, the title to which had already been fully adjudicated by this highest judicial tribunal in the State, whose especial privilege and duty it is to settle all controversies involving the rights of property, that we have misled you— our former decision was wrong—you have relied upon our judgment and you have lost your money—you have no title to the property you have bought—the banks of the Mississippi river below high water mark are public property, which all may freely use who choose.   Justice to the citizen, and the consistency and self-respect of the court, alike forbid such a course. That a sound public policy requires firmness and stability in adhering to decisions of this court settling rules of property, and especially when, as in this case, they have been acted upon for many years, and upon which important and valuable rights have been based, must be too manifest to require any illustration or enforcement.   We repose, therefore, with entire confidence upon the case of *Morgan & Harrison* v. *Reading*, as conclusive of this.   For even if there were good reason to doubt, as we insist there is not, the correctness of the conclusion arrived at in that case, we cannot believe this court will overrule it in this case, involving, as it does, the same question arising out of the same landing.   We may, however, in addi-

tion to the numerous authorities, both English and American, cited by the counsel for the defendant in error, and the court, in the very able and learned opinion by the chief justice, refer to several more recent American decisions sustaining the right of the riparian owner to the soil in the banks of rivers admitted to be navigable, in the common or popular meaning of that term, but not in its technical, common law sense, and in subordination to the regulations to be presented by the Legislature for the general good.   See *Walker* v. *Shepardson*, 4 Wis. 486 ; *Stuart* v. *Clark*, 2 Swan's R. 9, overruling on this point the previous decisions in Tennessee ; *Thurman* v. *Morrison*, 14 B. Mon. 367 ; *Lorman* v. *Benson*, decided by the Supreme Court of Michigan, and reported in the February No., 1860, of the American Law Register, 219.   This last-named case appears to have been very fully argued, and contains a clear and lucid review of the English cases, and we invite the attention of the court especially to it.

The counsel for plaintiff in error seem to think that *Morgan & Harrison* v. *Reading* has been already overruled by this court in the case of the *Commissioners of Homochitto River* v. *Withers*, 7 Cushman, 21.   But that is clearly an error of counsel.   The question decided in the former did not arise in the latter.   The facts in the two cases were not even similar.   There was no claim to charge wharfage for the use of the bank of any river, nor right asserted in the soil between high and low water mark, either presented by the record or decided by the court in the latter case.   The distinction between the two cases is clearly and expressly stated by the court ·in the opinion delivered in the latter.

We admit that the question of what are and what are not navigable rivers, according to the doctrine both of the English and American courts, was to some extent discussed by counsel, as well as the court, in the latter case, yet it certainly was not a point presented by the facts of the case for the decision of the court, and was not *even alluded* to by the Supreme Court of the United States in the opinion delivered by that court in the same case, unless it was in the statement that these were questions

discussed by counsel which were only calculated to confuse and render obscure the real points involved.    See 20 How. 87.

In 1850, the Legislature of Mississippi passed an Act for the improvement of the navigation of the Homochitto river.    The commissioners oppointed to carry out the provisions of that Act were about to cut a canal whereby the waters of the Homochitto were to find an outlet into the Mississippi river through Buffalo river, instead of through Old river, as had always been the case prior to that time.    Withers filed a bill to enjoin them from doing so, upon two grounds: first, that he was the owner of a large and valuable body of land fronting on Old river, (not bordering on either the Homochitto or Mississippi river,) which he alleged was the natural outlet of the Homochitto into the Mississippi, and he therefore had a vested right in the use of the waters of that river, and hence the Act of the Legislature authorizing a diversion of said waters from their natural channel, and away from his place, was taking private property for public use without first making compensation therefor, and consequently unconstitutional; and secondly, that the Act of the Legislature was void, because it was repugnant to the Act of Congress of 1817, to enable the people of the western part of the Mississippi territory to form a constitution and State government, &c. These were the only questions presented in the case.    And the court decided that the Act of the Legisfature was neither unconstitutional nor repugnant to said Act of Congress. That was the full scope and extent of that decision, as we understand it.    We feel confident, therefore, that the court did not intend to overrule, and could not have intended in that case to overrule *Morgan & Harrison* v. *Reading*, which we insist is now, and we· believe always must be, the settled law of this State.

HARRIS, J., delivered the opinion of the court:

These two cases are submitted to us together on writs of error to revise the judgments of the Circuit Court of Warren county upon an agreed state of facts appearing in these records.    They were submitted to the court by the consent of the parties waiving a trial by jury, and judgments entered for the defendant in error.

The facts agreed on are the following: It is admitted that the lots in the city of Vicksburg fronting on the bank of the Mississippi river, and in front of which, between high and low water mark, defendant (below) landed, were owned by plaintiff (below) under regular deeds or conveyances from the patentee from the United States of America, and that, as such riparian proprietor, the plaintiff has for years claimed and exercised ownership over the landing in front of his said lot, between high and low water mark, and collected wharfage from flat boats and other water craft for landing there; and also, for the last twelve months, from steamboats. It is further admitted that plaintiff, (below,) by his duly authorized agent, published in the *Vicksburg Whig* a notice in the words and figures following, to wit: "Notice, &c."    *    *    "Steamers in the cotton trade will be charged at the landing between the red posts, south of the Prentiss house, as follows, from and after this date: All steamers of 500 tons and under per trip, $25.00; all steamers over 500 tons, at the rate per ton, 5 per cent.

"Vicksburg, Oct., 1858.          "Wm. E. Thomas, Agt.

"P. S.—An error has been fallen into lately respecting the wharfage below, and the above notice will leave no doubt.

"Oct. 21st."

That said notice was published in said newspaper from the 21st October, 1858, up to the time of this agreement, and is yet in said paper in a state of publication. It is further admitted that defendant (below) is a steamer of over five hundred tons burthen; that she was running as a packet in the cotton trade between New Orleans and Vicksburg, and landed at and used said landing claimed by plaintiff below,    *    *    for the purpose of receiving and taking in cotton at the time specified in the account filed with plaintiff's complaint, and used the same for the space of twenty-four to thirty-six hours each trip. It is further admitted that the regular steamboat landing at Vicksburg is six or eight squares above the landing used by defendant, (below;) but the landing used by said defendant is the same that is ordinarily and almost universally used by packets in the cotton trade for receiving and taking on board their cargoes of cotton, being always charged by plaintiff for the use of the land-.

ing for that purpose. It is further admitted that defendant (below) was a regularly enrolled and licensed steamer, navigating the waters of the Mississippi, at the time specified, all according to law, and fully authorized so to do.    \*    \*    \*
That there was no use or occupation of plaintiff's land beyond high water mark; the only portion used and occupied being the bank of the river between high and low water mark. That there was no artificial wharf at or adjoining the place where said steamer lay; but that plaintiff (below) had graded the bank of the river at that point for the better accommodation of boats landing there; but the bank was occupied by said steamboat for the purpose of taking on board a cargo of cotton, and for no other purpose; that the point at which said steamboat lay is within the limits of the city of Vicksburg, which is an incorporated city under the laws of the State of Mississippi.

The agreed state of facts in this record are almost identical with the case of *Morgan & Harrison* v. *Reading,* 3 S. & M. 366, decided in this court. What are the rights of the riparian owners, and what the *jus publicum* incident to the free navigation of the Mississippi, are questions there discussed, and are the important questions here again presented.

It has been the chief end and policy of civil society to assign to every thing capable of ownership a legal and determinate owner; to secure common or public rights so far as the interest of the public require; to furnish a proper line of demarcation between these rights, common to all, and those private rights which belong to each individual as his exclusive property; and thus to promote the general peace and harmony of mankind.

Hence the general distinctions so long declared and recognized by learned judges and law writers, and deemed by them of so much excellence and importance as to be regarded as beyond all question.  " That rivers not navigable (that is, fresh-water rivers of what kind soever) do, of common right, belong to the owners of the soil adjacent.   But that rivers, where the tide ebbs and flows, belong to the State or public; that this ownership of the citizens, in both the soil and the use of the water of the rivers, is absolute; subject only to the right of way or public easement therein, where the same is capable of such use.   That when the

citizen derives his title to land bounded on a river, not naviga-
ble, (that is, not on tide-water,) by grant from the State, such
grant extends to the middle of. the river—'*usque filum aquæ.*'
But when such grant is bounded by the sea, or an arm of the
sea, or by tide-water, (which are technically called *navigable*
waters,) such grant only extends to ordinary high water mark."

The failure properly to apprehend the true reason for this dis-
tinction, universally stated and recognized among the common
law jurists to a comparatively very recent period, has led to
some confusion in a few cases in this country, not reconcilable
with these general principles.

Before proceeding to notice these cases, we will recur to the
true reason and foundation of this distinction between tide-water
and fresh-water streams.    Why then should the sea and its arms
be called "*navigable*," while great rivers, bearing the commerce
of states and nations, and navigated every day, are termed "*not
navigable?*"

And, *first*, it is to be remarked that, when the term *navigable*
is used by common law writers in this connection, it has refer-
ence to the *right* which *all nations* have, of navigating the ocean
and its arms as common highways of mutual intercourse and
commerce, over which no people or nation has exclusive control,
and in which no nation has a right of property.    It has no
reference to *capacity for navigation*.    While many of our rivers
lying in the interior and wholly within the jurisdiction of the
State, are *capable of navigation*, they are not "*navigable*" *for all
the world*, except by the permission of the sovereign having .
jurisdiction over them.    Foreign nations—strangers—have no
*right* to use them against our will.

The air, running water, the sea, and, consequently, the shores
of the sea, by the laws of nature and of nations, are common to
all mankind.    No man is prohibited from approaching the sea-
shore, therefore, while he abstains from damaging farms, &c.,
which are not in common as is the sea.    Cooper's Justinian, p.
67, sec. 1.

The ocean does not admit of property therein.    It is not
capable of occupancy.    It has no boundaries.    It is not con-
tained in shores, for it encompasses the land, (continents and

islands,) and is not encompassed by it.    It is, therefore, incapable of appropriation.    Rutherforth's Inst. of Natural Law, chap. 5, sec. 1, 2, p. 38, 39 ; Grotius, Book II. sec. 3, sec. 7 ; Vattel, Law of Nations, p. 124–126, sec. 279–285.

*Second,* it is to be remembered that the *territory of a state* only includes the lakes, seas, rivers, &c., entirely enclosed within its limits, (Wheat. International Law, p. 242, 243,) or that a state cannot grant what it does not own.

The jurisdiction possessed by one nation over sounds, straits, and other arms of the sea leading *through* its own territory to that of another, or to other seas, common to all nations, does not exclude others from the right of *innocent passage* through these communications.    Vattel's Law of Nations, Book II. p. 180, 181; Wheaton, International Law, p. 243, sec. 12.    The same principle extends to rivers flowing from one state into another.    Ib. But this right of navigation for commercial purposes, intra-territorially, or the right of innocent passage, as it is called, is an *imperfect right,* of which each state must judge for itself.    The right of navigation and the right to moor vessels to the banks, to load and unload, to land in case of distress, or for other *necessary* purposes, as incident to such *innocent passage,* are *all imperfect rights* in their nature, and the mutual convenience of both parties must be consulted in their exercise.    Wheat. International Law, p. 243, 244, sec. 13, 14; p. 251, sec. 18; p. 255, sec. 19; Vattel's Law of Nations, p. 129, sec. 290, 291, 292.    But the case of rivers and waters, which are wholly intra-territorial, which rise and debouch altogether within the limits of the state, are not to be confounded with waters flowing *through* the state from other states, or discharging themselves in other states. While the *right* of navigation in the former case depends exclusively on the will of the local sovereign, in the *latter* the right of navigation is one, as we have just seen, to be exercised according to the mutual convenience of the parties.    Wheat. International Law, p. 256, sec. 19.    The shores of *the sea* belong to the adjacent nation or sovereign, subject to the public right of free navigation.    They are common to all mankind, in regard to their *innocent use,* as for navigation in commerce, &c.

Ports and harbors are manifestly an appendage to and even a

part of the country, and, consequently, are the property of the nation.

So bays, whose entrance can be defended, may be possessed and rendered subject to the laws of the sovereign. Vattel's Law of Nations, p. 129, sec. 290–292.

And so as between nations, where an arm of the sea or a river is the boundary between them, if the original right of jurisdiction is in neither, and there is no agreement respecting it, each holds to the middle of the stream; while the public easement or right of *innocent use* still remains undisturbed thereby. Angell on Tide-Water, p. 7; Vattel's Law of Nations, B. I. ch. 22, sec. 266, 274; The Schooner Fame, 3 Mason Circt. Ct. R. 147.

It is evident, therefore, that the term "*navigable*," as used by the common law writers, was borrowed from the law of nations, and has reference to the *right* of free navigation of the ocean, and the arms of the sea, not *mare clausum*, over which no nation has exclusive ownership. It has reference to the great *admitted right of navigation*, with all its necessary incidents, resulting from the *common property* which all nations have in the sea and its great arms and shores, without hindrance therefrom by *grants*, extending beyond high water mark. Beyond this, no nation has exclusive territorial property; though it has jurisdiction, civil and criminal, for the protection and preservation of the rights of its citizens, and power to establish ports and harbors and police regulations for the promotion of commerce. It has reference to the *usage* of civilized nations, extending this *right* as far as the tide ebbs and flows; subject, however, as we have already seen, in this respect, to the will of the local government *within* whose dominion such right may be exercised.

In obedience therefore to the laws and comity of nations, it became, at an early period in its history, the doctrine of the common law, that grants of land, by the sovereign power, bordering on *tide water*, extended only to high water mark; leaving the water and the shore *below* ordinary high water mark subject to this general use or public easement, for commercial and other purposes, as the common highway of all nations.

This was a doctrine of presumption, founded on the idea that no nation intended to interfere with the just rights of others, or

with that mutual comity and convenience upon which their trade and commerce depended.

On the other hand, a doctrine wholly opposite to this, and founded upon reasons equally clear and satisfactory, was established in relation to fresh-water streams, whether having *capacity* for navigation or not, which were *intra*-territorial, and over which the government had *exclusive right and dominion*.

In relation to this class of rivers, the *right of navigation* was always wholly dependent on the *will* of the sovereign having the right of property in the soil; and by the laws of nations, such streams were "*not navigable*" for other nations, except by treaty or special permission of the local sovereign. Hence they are called "*not navigable*," in *contradistinction* to such waters, &c., as were common to all nations.

In the construction of grants of land made to the citizen and bounded on these fresh-water streams, over which the sovereign had exclusive title and jurisdiction, there could be no question of the *right* of the sovereign to part with the title of the soil to the grantee. It became therefore a mere question of intention. The courts of common law applying to these deeds or grants the ordinary rules of construction, in cases of doubt, construed the grant most strongly in favor of the grantee; and upon the further presumption that the grantor, in parting with his land on both sides of a water-course, whether capable of navigation or not, could scarcely have intended, without express clause to that effect, to reserve the water-course to himself, have held with unvarying uniformity in England, from the earliest period down to the day that such grants, bounded *on*, or *by*, or *at*, such water-course, conveyed to the respective riparian grantees the right of soil and the use of the water (subject to the *jus publicum*) *ces que ad filum aquæ.*

Lord Hale, in his treatise *De jure maris*, (1 Harg. Tracts, inserted in 6 Cowen N. Y. R. *Ex parte Jennings*, p. 537,) says, "Fresh rivers of what kind soever do of common right belong to the owners of the soil adjacent."   *   *   *   *   *   * "Though fresh rivers are in point of *property* as before, *prima facie*, of a private interest; yet as well fresh rivers as salt, or such as flow and reflow, may be under these two servitudes, or

affected by them, viz.: one of prerogative, belonging to the king, and the other of public interest, or belonging to the people in general."

Lord Hale, in the 3d chapter of his treatise *De jure maris*, distinguishes these streams or rivers, first, into such as are private, not only in *property or ownership*, but also in *use*, "as little streams and rivers that are not a common passage for the king's people."

2. Those that are of common or public use, for boats and lighters, &c., whether fresh or salt; these are, *prima facie, publici juris*, common highways. "Thus, the rivers Wey, Severn, Thames and divers others, as well above the bridges and ports as below; as well above the flowings of the sea as below; and as well where they have become to be of private property, as where they are the king's property, are public rivers, *juris publici*."

They are called public rivers, not in reference to the *property* of the river, for that is in the individual who owns the soil; but in reference only to the public *use*. This is the true and just rule which harmonizes private right with public interest. Angell on Water Courses, p. 199, 200, and authorities there cited. 6 Cowen, 537, *Ex parte Jennings*, and note by the reporter, and authorities reviewed.

A more perfect regulation could not be devised. It effectually secures the public interest, guards private rights, and promotes the ends of civil society, and the peace and security of individuals, by pursuing the wise maxim of assigning to every thing capable of ownership a legal and determinate owner.

According to Sir Matthew Hale, there was always jurisdiction in the crown of England "to reform and punish nuisances in *all rivers*, whether fresh or salt, that are a *common passage* not only for ships and greater vessels, but also for smaller, as barges or boats." *De jure maris*, Part I. ch. 2, p. 8; 6 Cowen, p. 538.

He adds that these public rivers for public passage are called *fluvii regales*, not in reference to the *property* of the river, but to the *public use;* all things of public safety and convenience being in a special manner under the king's care and protection, whether the *soil* be his or not. Id.

It is clear, therefore, that public rivers having capacity for navigation were always highways by the common law, and subject to public use, no matter who owned the soil. Indeed it seems equally clear, that any grant in derogation of this public right, previously existing, and in direct opposition to that duty which the law casts on the crown, of reforming and punishing all nuisances which obstruct the navigation of public rivers, could not have been in its inception valid at common law. *Williams* v. *Wilcox*, 33 Eng. Com. Law R. 402; 8 Adolphus & Ellis, 314; Angell on Water Courses, 202.

However this may have been at common law, it is certain that under the deed of cession from Georgia, as well as the several acts and ordinances in reference to the free navigation of the Mississippi river, as a common highway, no grant could have been made here, interfering with this great public right. There is therefore no inconsistency, but, on the contrary, as before suggested, perfect harmony between the *jus privatum* of riparian ownership in public fresh-water streams, to the middle of the river, and the *jus publicum* of free navigation thereof. The *soil* is granted to the riparian proprietor, subject to this public easement.

A review of the American decisions will show that these just maxims of the common law, founded on the law of nature and of nations, and sanctioned by reason as well as unbroken precedent, in England, for centuries, have not been seriously doubted or contravened in any well-considered case involving the rights of riparian owners in this country.

The first case in the United States, or in the world, where the common law prevails, that we have been enabled to find, in which the correctness of the common law distinction between tide-water and fresh-water streams seems to have been questioned, is the case of *Carson* v. *Blazer*, 2 Binney's Pennsylvania R. 477, decided in 1810.

The opinion was delivered by Chief Justice Tilghman, who distinctly admits the rule in England.

He says: "The plaintiff relies principally on that rule of the common law by which rivers wherein the tide does not ebb and flow (which are *not navigable*) belong to the owners of the ad-

joining lands on each side. This common law right, if even it was properly applicable to the Susquehanna, and Delaware, and other large waters, was not deemed proper for this country, nor was it adopted up to the period of our Revolution, because the several Acts of Assembly before that time declaring these rivers to be highways, and regulating the fisheries in them, are incompatible with the common law right; and, since the Revolution, no part of the common law has been adopted, except that which was proper for our country.

"But the common law principle concerning rivers, even if extended to America, would not apply to such a river as the Susquehanna, which is a mile wide, and runs several hundred miles through a rich country, which *is navigable, and is actually navigated* by large boats. If such a river had existed in England, no such law would ever have been applied to it. Their streams in which the tide does not ebb and flow are small."

From this citation of the opinion of the chief justice it is evident that he has wholly misconceived the reason upon which the common law distinction is founded. He seems to suppose that the rule is an arbitrary one, based upon the *capacity* of the stream for navigation. If *navigable in fact*, he thinks, the *soil* under the water is not the subject of grant so as to be capable of private ownership, notwithstanding such ownership may be subject to the *public easement*.

He seems not to apprehend that the great principle, lying at the foundation of the rule, ("that a grant of land, bounded on the ocean or its arms, or tide water, extends only to ordinary high water mark,") is, that a *sovereign* making such grant, by the laws and comity of nations, has no *power* to appropriate to *private use* what is not only *juris publici*, or common to the whole world, and therefore incapable of ownership, but what lies beyond his territorial dominion.

He seems to have confounded the *right of navigation* (in which sense tide waters are said to be "*navigable streams*") with their *capacity* for navigation. And still further, he seems to have supposed that there was an irreconcilable conflict between the public right of free navigation of fresh-water rivers and the *private* ownership of the *bed or soil* of the river, subject to the

public use or easement. We think we have already demonstrated the fallacy of these views in discussing the true reason of the common law rule, and need not here repeat what we have said on that subject.

A further quotation from the opinion of Chief Justice Tilghman will make it still more manifest that he wholly mistakes the common law principle itself. "The common law principle is, in fact," says he, "that the owners of the banks have no right to the *water* of *navigable* rivers. Now the Susquehanna is a *navigable* river, and therefore the owners of its banks have no such right. It is said, however, that some of the cases assert that by *navigable* rivers are meant rivers in which there is *no* (meaning *a*) "flow and reflow of the tide. This definition may be very proper in England, where there is no river of considerable importance, as to navigation, which has not a flow of the tide; but it would be highly unreasonable when applied to our large rivers, such as the Ohio, Alleghény, Delaware, Schuylkill, or Susquehanna and its branches."

A graver blunder could not have been well conceived by the chief justice than that implied in the assertion commencing this last quotation. Such a principle was never mooted or stated before, for the reason that nobody ever supposed that the owner of the banks of *any* public stream, whether *navigable* or not, had a "right to the *water.*" Indeed, in no case of running streams, whether *capable* of navigation or not, was such a principle ever heard as that the owner of the bank had a "right to the *water.*" The thing is in its very nature impossible. The *usu-fruct* of running or tide water, or any natural stream, is all that in its nature is capable of enjoyment, and this right must be so used as not to prejudice the rights of others.

This general doctrine is as old as the Year-books, that, *prima facie*, every proprietor on each bank of a river is entitled to the *land* covered with water to the middle of the stream. In virtue of this ownership, he has the right to the *use* of the water flowing over it in its natural current without diminution or obstruction. But, strictly speaking, he has no property in the *water* itself, but a simple use of it while it passes along. Angell on

Water Courses, 11, 12; *Tyler* v. *Wilkinson*, 4 Mason's R. 400, by Judge Story.

Chief Justice Tilghman was scarcely less intelligible in that portion of his opinion in which he endeavors to account for the common law distinction between tide and fresh-water streams in England, by assuming that "*their* rivers in which the tide does not ebb and flow are small," and also that "there is no river of considerable importance as to navigation (in England) which has not a flow of the tide." If by this is meant that there are no rivers in England capable of navigation above tide water, then the opinion is not more fortunate in its geographical and historical accuracy than in its statement of the principles of the common law in relation to riparian rights.

Independent, however, of all this, there is another answer to the decision in this case, as an authority against the common law rule, and that is, that the opinion is based mainly on the ground that, by the laws and policy of Pennsylvania from her first settlement, as well as the settled policy of her founder, William Penn, the entire right of her rivers and every thing in them was retained in them in order that he might make such use of them as might be most conducive to the public interest. And both in the courts of the United States and our State courts, this decision is said to rest on this ground—the local laws and policy of Pennsylvania. *Rundle et al.* v. *Delaware and Raritan Canal Co.*, 14 How. U. S. R. 91, reviewing the cases in Pennsylvania. See, also, 1 Watts & Serg. 346; 6 Watts & Serg. 101; 8 Watts & Serg. 436; 1 Penn. R. 468; 31 Penn. St. R. 43; 33 Penn. St. R. 305.

This is made manifest by the subsequent case of *Shrunk* v. *The President of the Schuylkill Navigation Co.*, in 14 Serg. & Rawle, 79, where the same judge, Chief Justice Tilghman, says: "As for the soil over which our great rivers flow, *it has never been granted to any one*, either by William Penn or his successors, or the State government. Care seems to have been taken from the beginning to preserve the waters for public uses, both of fishery and navigation."

In this opinion the same high functionary again alludes, in terms of *less confidence*, to the position which he himself had

*originated,* in the following terms : " The common law does not vest the right of soil or fishery in the owners of land on the margin of *navigable* rivers—that is, rivers where the tide ebbs and flows.   The great rivers of America are so different from those of England that, *in the opinion of many,* [his own opinion and one case in South Carolina, of very doubtful authority,] the same definition of a *navigable* river cannot properly be applied to both."   Many of our rivers are navigable in their natural state, " and whether, if such rivers had existed in England, the rule of the common law might not have been different; may certainly admit of question.   As to the extension of that law to the American rivers, the judges of different States have held different opinions."   He then cites Massachusetts, Connecticut, and New York, as against his view, and his own opinion in *Carson* v. *Blayne,* above cited, and the South Carolina case of *Cates* v. *Wadlington,* from 1 McCord R. 580.   This case was decided by Chief Justice Tilghman in 1826, sixteen years after his first decision, and *neither* was cited, nor their doctrines approved in any case in the United States, until 1836, when Senator Beardsley, in the case of *The Canal Appraisers* v. *The People,* 17 Wend. N. Y. R. 618, cited and relied on them.   This case in New York, however, never was there regarded as authority, and was subsequently overruled, directly, on this point, if indeed it was ever intended by a majority of the senators to overturn the authority of previous cases thereby.   26 Wend. 416.   It is true that, in the case already referred to of *Cates* v. *Wadlington,* 1 McCord, 580, in South Carolina, a loose remark was made by Mr. Justice Nott which would seem to indicate a coincidence in his views with those of Chief Justice Tilghman.   Yet he had evidently not seen the case in Pennsylvania which had been then decided, and had not considered the question maturely.   The question did not necessarily arise in the case before him, as the river *then* the subject of inquiry was not *navigable, in fact.*   And in the late case of *McCullough* v. *Wall,* Rich. Law R. 85, decided in 1850, Justice Wardlaw, after citing and. reviewing the case of *Cates* v. *Wadlington* in 1 McCord, says: " We can, however, safely say that no authoritative decision has yet been made in this State, which has changed the common law on the subject."

And this is the conclusion of the court after reviewing all the cases in South Carolina, *Boatright* v. *Bookman*, Rice R. 447, *Jackson* v. *Lewis*, Cheves R. 259, included. So that South Carolina cannot be quoted as an authority to sustain the views of Chief Justice Tilghman.

North Carolina, too, has been cited as furnishing authority for the position of Chief Justice Tilghman, against the common law rule as applicable in this country. While it is true that, in the earlier cases, there are loose dicta from which this doctrine would seem to derive support, yet, in the later cases, their decisions are rested on *statutory enactments* of that State by which land covered by fresh water, *navigable in fact*, could not be granted, any more than land covered by tide water, at common law. *Collins* v. *Benbury*, 5 Iredell's Law R. 126; *Wilson* v. *Forbes*, 2 Dev. 30.

The case of *Bullock* v. *Wilson*, 2 Porter's Ala. R. 448, has also been cited as an authority against the application of the common law doctrine to the fresh-water streams of Alabama. An examination of that case will show that the opinion of the court is based upon the idea that, inasmuch as the rivers of that State, *capable* of navigation, whether subject to the ebb and flow of the tide or not, are made *public highways* by law, riparian owners can assert *no right of soil* in them or in their beds. A supposed inconsistency between the public easement or right of way and the ownership of the soil by the private citizen seems to have controlled the opinion. The subsequent cases *in Alabama*, as indeed the whole current of judicial decisions both in England and in this country, at all times show that there is no such conflict. The doctrine in relation to highways, whether on land or water, always has been that the *jus publicum*, or right of way, did not interfere with the title or ownership of the soil; that the *private* right still existed, subject to the public easement. This doctrine is recognized by Judge Collier himself in *The Mayor of Mobile* v. *Esland*, 9 Porter's Ala. R. 590, 591, and is too well established to need remark. Hale, *De jure maris*, chap. 6; 1 Harg. Law Tracts, 36; *Commonwealth* v. *Alger*, 7 Cushing's R. 90. "The *jus privatum* of the owner is always charged with, and subject to, the *jus publicum*

which belongs to the king's subjects; as the soil of an highway is, which though, in point of property, it may be a private man's freehold, yet is charged with a public interest of the people, which may not be prejudiced or damnified." The doctrine is, that the government or sovereign originally held·their *public rights in trust;* that they are inherent in the people, and incapable of delegation to their prejudice; that all grants made by the government are made subject to the public right of navigation. This is the true rule which harmonizes private right with the public use or interest in streams and highways generally. Angell on Tide Waters, chap. 8, p. 199–204, and authorities cited.

So, in Iowa, the common law rule is rejected, relying on the Alabama case; 4 Iowa R. 213.

In Missouri, 4 Missouri R. 346, *O'Fallon, exr., &c.,* v. *Daggett et al.,* although the syllabus of the case, as stated by the reporter, would seem to support the idea that the bank of the Mississippi river is a public highway, subject to the use of those navigating that river, yet the opinion, when examined, is an authority in favor of the rights of the riparian owner. It is there held, upon clear and satisfactory reasoning, that, except in public places, provided for their accommodation, the public have no general right to seize on the private property of the riparian owner, on the bank of the river, more than elsewhere; that the right to *land* "is limited in cases of *necessity and emergency,* and is not extended to cases of mere convenience." And in the subsequent case of *Lebeaume* v. *Poctlington,* 6 Missouri R. 40–42, this case is cited without objection; and it is said that " it is certain that the United States never made any grant of lands incumbered with the conditions annexed to grants of land on the Mississippi under the Spanish government. In the States of the Union that government (the United States) would have no such authority, as it would be a mere police regulation outside of its constitutional powers."

In Kentucky, similar views are stated as to the rights of riparian owners, in *Morrison* v. *Turman,* 17 Ky. R. 250, and 14 Ky. R. 367, (same parties.)

In Tennessee, it is well settled that the ownership of the soil, in fresh-water rivers, though capable of navigation, and navi-

gated in fact, is in the riparian owner to the middle of the stream, subject to the public easement for purposes of transportation and commercial intercourse; *Stewart* v. *Clark*, 2 Swan, 12–18. The previous case of *Elder* v. *Burrus*, so far as it is in conflict with this case, is overruled; *Elder* v. *Burrus*, 6 Humph. R. 358. See, also, *Corporation of Memphis* v. *Overton*, 3 Yerg. R. 387.

In Ohio, the doctrine has been uniform in favor of the rights of riparian proprietors, and it is there held that the Legislature cannot, by declaring a stream navigable, deprive the riparian owners of their rights. See 16 Ohio R. 540, and cases cited; 11 Ohio, 307; 3 Ohio, 495; 2 Ohio, 307.

So, in Michigan and Indiana, the common law rule is recognized. *Moore* v. *Sanborne et al.*, 2 Mich. R. 519; and *Cox* v. *The State*, 3 Blackfd. R. 193.

So, in Maryland. *Browne* v. *Kennedy*, 5 H. & J. 195.

So, in Maine. *Berry* v. *Carle*, 3 Greenleaf, 269; and *Sprung* v. *Russell et al.*, 7 Greenleaf, 273; *Browne* v. *Chadbourne*, 31 Maine R. 9.

In Vermont. 23 Vermont, 319.

In New Hampshire. 3 N. H. R. 321.

In Connecticut. 2 Conn. R. 481.

In Virginia. 4 Call's R. 441. The common law rule is maintained.

And in New York, upon a full and able review of all the cases, English and American, the doctrine of the common law is established by repeated adjudications. It is true, that in one case in New York it was said the preceding decisions had been overruled; *The Canal Appraisers* v. *The People*, 17 Wend. 571. But it is by no means certain that it was so designed by a majority of the members of the court. At all events, subsequent cases have continued to affirm and approve the common law doctrine, which seems now to be firmly established there as almost everywhere. *Palmer* v. *Mulligan*, 3 Caine's R. 317; *Hooker* v. *Cummings*, 20 John. R. 97; *Ex parte Jennings*, 6 Cowen R. 518; *Lansing* v. *Smith*, 8 Cowen R. 148; *Starr* v. *Child et al.*, 20 Wend. R. 149; *Pearsall* v. *Port*, 22 Wend. R. 425; *Commrs. of Canal Fund* v. *Rumpshall*, 26 Wend. R. 404. *3 3 N. Y. 4 6 l.*

These cases in New York have exhausted the resources which

great learning, intellect and research could bring to bear on this interesting subject; and but for the tendency of a few decisions of late date in the opposite direction, we should feel that the labor we have bestowed, in reviewing the whole subject, was time unnecessarily spent.

In Delaware, Massachusetts, Maryland, New Jersey, and Illinois, the same course of decision prevails; 4 Harrington, 389; 4 Pick. 268; 5 Pick. 199; 2 Cushing, 199; 7 Cushing, 102; 5 Harris & Johnson, 195; 1 Dutcher, 527; 3 Dutcher, 13. 7 *all* 11 *158.*

It will thus be seen that so far as the weight of authority is to be considered in the United States, the cases in Pennsylvania and North Carolina, founded on their peculiar policy and laws, one case in Alabama and one case in Iowa, *both* without reasoning or authority to sustain them, are the only cases in which the common law rule has been questioned; while in nearly all the other States, and in many of them after the most mature and thorough consideration and research, the common law rule has been fully sustained.

A much shorter, and, to my mind, more satisfactory mode of reasoning, reaching the same conclusion, may be deduced from a few well-settled general principles of the common law of almost universal application.

All grants and contracts are to be construed as having reference to the laws and policy of the State or country where the contract is made, or the property which forms its subject is situate.

At the time the title to the lands in question on the banks of the Mississippi river were granted by the government of the United States, the common law prevailed in the State of Mississippi. Indeed, the common law had probably prevailed over this territory as a part of the British grant to Oglethorpe of the colony of Georgia, long anterior to the deed of cession by Georgia to the United States; see *Morgan et al.* v. *Reading,* 3 S. & M. 366. The purchasers of these lands bounded on, or by, or at the Mississippi river, therefore, took such right, title and boundary as the language and construction of these grants imported by the rules of the common law.

We have already seen that there is not a case to be found,

either English or American, which doubts or disputes that by the common law of England the right of the riparian owner, on the banks of fresh-water streams, extends to the middle of the stream, subject always to the public right of free navigation.

On the principle that we sit *jus dicere non jus dare*, the common law rule must control us until changed by legislation.

What then are the rights of the riparian owner? All public rivers, whether technically navigable or navigable in fact, must remain free and open, subject to the *jus publicum;* but the absolute right of approach on each side can only be by *public and general ways;* consequently, if an individual have land adjoining a river he may reasonably refuse permission to any person to go over it to approach the river, and demand any sum he thinks fit for the permission, unless there be a *public way* over it; nor have the public any right, at common law, to tow on the banks of any public river; Vattel's Law of Nations, p. 44, n. 47; *Ball* v. *Herbert,* 3 Tenn. R. 253 ; Angell on Water Courses, 202.

In England such a right might have existed by custom or prescription; *Pierce* v. *Fauconberge,* 1 Burrows, 292. In the absence of such custom or prescription, no right to approach a river over private grounds exists; *Parthericke* v. *Mason,* 2 Chitty R. 658; *Wyatt* v. *Thompson,* 1 Esp. R. 252.

So, if a private individual make and repair a bridge over a river, he may insist upon any person using it paying him toll, as in the instance of *Putney and Fulham Bridge.* In these cases the demand of an exorbitant toll may be *illiberal,* but is no more *illegal* than a nation's refusing to sell its superfluous produce or to admit free passage through its country.

The right to pass at a moderate toll is a moral but imperfect right; Vattel, p. 44, n. 47, and p. 38, 39, sec. 91, and preliminary secs. 5, 6, p. cxi. Angell on Water Courses, 4–7.

We derive the right to buy what we need from the law of nature, and to *demand* all other *necessities* whether as nations or individuals which our *absolute wants require;* or, in other words, which our *safety* and *existence* render *needful.* This principle is as well applicable, too, to highways on land as highways on water. Shelter from storm or cold, or other casualties threatening life, are incident to the right of way *on land;* and

similar rights, depending on the same principles, attach to the traveller on aquatic highways. But no one would contend, even in such necessity, that the traveller has the right thus to consult his safety or convenience to my detriment without making just remuneration. See Rutherforth's Inst. of Natural Law, p. 38, ch. 5, secs. 1 to 9; Justinian, p. 68, sec. 4; Rutherforth, 45.

"The right of *extreme necessity*," says Mr. Rutherforth, p. 4, "sets aside property." This, perhaps, is a little too broadly stated, for, while it may *take away* property, it does not deprive the owner of the right of compensation, and cannot, therefore, be said to *set aside* property. See Grotius, Book 2, ch. 3, secs. 6 to 11.

It is certainly unintelligible to say that one man may have an exclusive right to the soil granted to him by the nation, and yet, that another may use it when he pleases or at his convenience. To give any one besides the proprietor such a claim or right after property is introduced, some reservation must be shown, either in the grant itself, or as *necessarily* implied and incident thereto in its very nature.

Two exceptions to the exclusive right of property are stated and defended by Grotius with great force:

First. The right of extreme necessity, just mentioned. As in navigation, if the common stock of victuals be spent, what every particular man hath is held as common. So, in case of fire; if I cannot otherwise avoid it, I may pull down my neighbor's house to preserve my own. And on the seas, if my ship fall foul or be entangled with another, I may cut their cables to free myself.

This right of extreme necessity is founded upon the presumption, that no compact, either express or tacit, could so introduce property as to alienate the natural right and the necessary means of self-preservation. However therefore mankind may have consented to the introduction of private property, yet, in whatever respect such property may become absolutely necessary for the preservation of individuals, they are still in common.

The second exception stated by Grotius is that of "*innocent profit*," and for this he cites Cicero and Seneca and Plutarch; as to kindle a coal at our fire, to light a torch or candle by ours, to navigate and to use rivers, &c. And he says, "the reason is the same here as above, because it is very probable that dominion

was introduced at the first with this limitation, that such things should remain in common use which might be profitable to some and not hurtful to others. And therefore the first authors of propriety are conceived to have thus agreed to it." Grotius, 2d Book, chap. 2, p. 81, 82, 83.

Rutherforth, in his Institutes of Natural Law, discusses both these exceptions, their reason and limitations, with great perspicuity.

In treating of the last, the right of innocent or "*harmless profit*" as he terms it, he says: To support this right we must look back to the reason for introducing property, which was, the impossibility that the same property should at one and the same time answer the uses which all or many might have for it; and as the *exclusive* right to a thing extends no further than the *intention* of mankind extended when they introduced it—and their *intention* cannot be understood to have extended further than the motive or reason which engaged them to introduce it—it follows that one man's property in the thing does not exclude another's right of *harmless* profit, because this right takes place *only* in those instances where the owner suffers no harm, or where the thing will answer all the purposes of the proprietor, notwithstanding the use another may make of it.

The author then proceeds to show that this right of *innocent or harmless use* of land or water is in its nature an *imperfect* right, or one of *imperfect obligation*, and they of whom it is demanded are at liberty to judge for themselves how far it is convenient for them to allow it. Rutherforth, 41–45.

*Individuals* therefore have no right, under any view, to appropriate private property to their private use without the consent of the owner, except in case of *extreme necessity*, and the *State*, under our constitution, can only do it upon just compensation first made.

The plaintiff below derived his title to the property in question under the common law. The title of Georgia to the territory which is the *situs* of this controversy was derived from Great Britain under the common law, and subject to its rules. The deed of cession, executed on the 24th April, 1802, was executed under the common law by Georgia to the government of the

United States, and the grants made subsequently by the government of the United States have been made under the universal understanding that they derived their binding force and authoritative construction from the rules and principles of the common law which prevailed at that time.

Whatever new doctrine, therefore, may have since originated in other States, their grants and titles, and the rights growing out of them, as understood at the time of the grants by all parties, cannot now be disturbed.

If this be not so, then by what authority, right or title does Mississippi claim jurisdiction over the east half of the Mississippi river?

The deed of cession from Georgia to the government of the United States refers for its descriptive boundary to the Acts of Congress organizing the Mississippi Territory, and cedes to the United States " all the right," &c., of the State of Georgia to the jurisdiction and soil of the land situated within the boundaries of the United States south of the State of Tennessee and west of a certain line, (the western boundary of the State of Georgia.) The Mississippi Territory, organized by Act of Congress, April 7, 1798, (Hutch. Code, 54,) was bounded *on the west* BY *the Mississippi river*. The Act of Congress of the 1st March, 1817, (Hutch. Code, 59,) authorizing the formation of a constitution and State government for the State of Mississippi, fixes its boundary as follows: *"Beginning on the river Mississippi at* the point where the southern boundary of Tennessee strikes the same; thence east, &c., &c., TO *the Mississippi river;* thence up the same to the beginning." It is provided through all these Acts that said river shall be a common highway and forever free, &c., without any tax, &c., imposed by the State.

The same uncertainty (if the common law rule in relation to riparian rights is to be rejected) exists in the Act of Congress of 1812, in reference to the Louisiana boundary.

If the position be true, therefore, that a grant of land on a fresh-water river *navigable in fact,* though not a "navigable stream" as defined by the common law, does *not* pass the title of the soil to the purchaser to the middle of the stream, then the United States acquired no title beyond high-water mark on the

Mississippi river as her western boundary by the deed of cession from Georgia; and the limits of the State of Mississippi, under the Acts of Congress organizing her territorial and State governments, extend no further than high-water mark on the eastern bank of the Mississippi river.

Where is that boundary? High-water mark on the Mississippi river, at some seasons, would exclude from our limits the most valuable portion of the State. To whom would this belong? Did the government of the United States not buy it from Georgia? Was no territorial or State government erected over it? Are all the surveys and grants and sales of this very territory, made by order and direction of the United States government, void for want of title from Georgia? If not, then it is by virtue of the common law doctrine, well understood and never doubted or disputed before the date of these transactions, that the government of the United States acquired the right of soil and jurisdiction over the Mississippi river to its middle under the Georgia deed of cession; and upon what principle shall we deny the same rights and the same construction, under precisely similar grants, to the citizens of Mississippi?

The whole legislation of Mississippi in relation to her western boundary is founded upon the rule of the common law, and her jurisdiction and right of soil to the middle of the river has been again and again asserted and acted on without dispute or denial. See Rev. Code, p. 47-49 and 67, Art. 101.

The case of the *Commissioners of the Homochitto river* v. *Withers* did not involve the questions here discussed. The points discussed in that case had reference to the power of the State over streams capable of navigation, and the right of the State to authorize their improvement.

There is no inconsistency in the *principles* decided in the case of *Morgan & Harrison* v. *Reading,* 3 S. & M. 366, and the case of the *Commissioners of the Homochitto river* v. *Withers,* 29 Miss. R. 21. The first involved the rights of the riparian owner as against the individual citizen claiming to use at his pleasure and convenience the private property of the riparian owner. The latter involved the right of the State to *improve* the navigation of a fresh-water river for the public use and convenience,

as a general public highway already existing, and never the subject of private property.

The case now before us falls under the principles of *Morgan et al.* v. *Reading*, 3 S. & M., and is indeed the identical same case.

Let the judgment be affirmed.

HANDY, J.   Without assenting to all the views taken in the above opinion, I concur in the result of it that the judgment should be affirmed.