## EX PARTE LOUIS FRITZ.

1. **FISH.** *State's right to control.*

   The state has the right to regulate the time, manner, and extent of the taking of fish in running streams and lakes with outlets into other waters.

2. **SAME.** *Board of supervisors. Code 1892, §§ 2126, 2127.*

   The statute, Code 1892, §§ 2126, 2127, giving the board of supervisors the right to regulate the taking of fish in their respective counties, is not invalid as giving a judicial body legislative authority.

3. **SAME.** *Ferae naturae.*

   Fish, being *feræ naturæ*, are not the property of any person until they have been subjected to his control.

4. **SAME.** *Statutes regulating. Constitutional.*

   A statute, regulating and restricting the capture of creatures *feræ naturæ*, not reduced to actual possession, is not violative of:

   (*a*) Constitution (state) 1890, sec. 14, providing that no person shall be deprived of life, liberty, or property except by due process of law; nor

   (*b*) Constitution of the United States, fourteenth amendment, providing that no state shall deprive any person of life, liberty, or property without due process of law; nor

   (*c*) Constitution (state) 1890, sec. 17, providing that private property shall not be taken or damaged for public use except on due compensation being first made to the owner; nor

(*d*) Constitution of the United States, art. 1, sec. 8, ch. 3, providing that congress shall have power to regulate commerce with foreign nations, and among the several states and with the Indian tribes, although the person capturing them did so with intent to ship them to another state.

5. SAME. *Ordinance of board of supervisors. · Special legislation.*

An ordinance of a board of supervisors of a county regulating the taking of fish therein which applies to all lakes and streams in the county is not special legislation.

6. JUSTICES OF THE PEACE. *Jurisdiction. Territorial limits.* Code 1892, § 2128.

Code 1892, § 2128, in so far as it commits the judicial administration of the game laws to mayors and justices of the peace, whether offenses were committed in their districts or not, is unconstitutional.

FROM the circuit court of DeSoto county.
HON. JAMES B. BOOTHE, Judge.

*Habeas corpus* by Louis Fritz to obtain his release from custody on a charge of unlawfully taking fish, and from a judgment denying the writ he appealed to the supreme court.

The facts are stated in the opinion of the court.

*Farley & Lauderdale,* for appellant.

First—The board of supervisors of DeSoto county had no constitutional power to pass or enact the ordinance involved.

Second—The legislature of the state had no constitutional power or authority to delegate, as attempted in Code 1892, ch. 54, to the board of supervisors of DeSoto county the power or authority to pass or enact said ordinance.

Third—Horn Lake is a water course, not navigable, not a channel of commerce, the bed or bottom of which is owned by the riparian owner or owners, and it is therefore private property, and the same cannot be so interfered with as to deprive the owner or owners of the legitimate use of same for purposes

of emolument or profit without due course of law and compensation.

Fourth—The legislature could not give the board the power to enact any criminal law and grant it the power to give justices of the peace and mayors territorial jurisdiction over the crime committed outside of said territorial district.

*Randolph & Randolph,* on the same side.

Fritz has acquired the title to the lands he now owns, under persons claiming through patents or grants made by the United States or the state of Mississippi, and his position is that the grant or patent of the land by the United States or the state of Mississippi passed to the patentees or the grantees, and from them to him, the title to the bed of Horn Lake to the center, where he owns the land only on one side of the lake, and the whole lake, where he owns the land on both sides.

Horn Lake is a pond or lake, not navigable technically and not navigable as a matter of fact, except for the purpose of floating small boats or skiffs or rafts, and the like, in an ordinary stage of water. It is valuable only for the purpose of fishing, and Fritz was engaged in fishing and in interstate commerce in sending the fish out of Mississippi and selling them in Tennessee and elsewhere.

The grant of the United States of land fronting on a stream of water, according to the rule adopted in disposing of the public lands, passed all the United States owned in the land and the water to the center of the stream of water. *Railroad Co.* v. *Schurmier,* 7 Wall., 272; *Hardin* v. *Jordan,* 140 U. S., 371; *Mitchell* v. *Smale,* 140 U. S., 406; *Kean* v. *Calumet Canal & Improvement Co.,* 190 U. S., 452; *Jeffries* v. *East Omaha Land Co.,* 134 U. S., 178; 2 Farnham on Waters & Water Rights, sec. 418; *Hardin* v. *Shedd,* 190 U. S., 519; *Firwan* v. *Murphy,* 109 Fed. Rep., 275, 279; *Pere Marquette Boom Co.* v. *Adams,* 44 Mich., 403; *Moore* v. *Robbins,* 96 U. S., 530;

*Lamprey* v. *State,* 52 Minn., 181 (53 N. W. Rep., 1139, and 18 L. R. A., 670).

The grants by the United States and the subsequent vendors of the fractional sections or parts of sections fronting on Horn Lake passed title, as we have stated, to the center of the lake, under the ordinary rule, or, according to the rule adopted in Indiana, to enough land covered by water, when added to the dry land, to make up the full area of the designated legal subdivision. *Tolleston* v. *State,* 141 Ind., 197; *Kean* v. *Robey,* 145 Ind., 221; *Kean* v. *Calumet Canal & Improvement Co.,* 190 U. S., 452; *Clute* v. *Fisher,* 65 Mich., 46; *Towell* v. *Etter,* 69 Ark., 34; *Jeffries* v. *East Omaha Land Co.,* 134 U. S., 176; *Cragin* v. *Powell,* 128 U. S., 691.

The rule was recognized and applied by Chief Justice Sharkey in *Morgan* v. *Reading,* 3 Smed. & M., 399, to the Mississippi river, and is supported by the authorities. 2 Farnham on Waters & Water Rights, sec. 413, p. 1415, and 3 *Ib.,* sec. 852, p. 2509, sec. 861, p. 2524, and sec. 866, p. 2528; *Lembeck* v. *Nye,* 47 Ohio St., 336; *Smith* v. *City of Rochester,* 92 N. Y., 463; *Lamprey* v. *State,* 52 Minn., 181 (53 N. W. Rep., 1139, and 18 L. R. A., 670); *Cobb* v. *Davenport,* 32 N. J. Law Rep., 369; *Rice* v. *Ruddiman,* 10 Mich., 125; *Ridgeway* v. *Ludlow,* 58 Ind., 248; *Governeuer* v. *National Ice Co.,* 134 N. Y., 355 (31 N. E. Rep., 365); *Kirwan* v. *Murphy,* 109 Fed. Rep., 275.

The common law of England was adopted as a part of the law of Mississippi, and where not unsuited to the condition of the people, or repugnant to the constitution or the spirit of the government, or changed by statute, remains in force. *Noonan* v. *Mississippi,* 1 Smed. & M., 562; *Hemingway* v. *Scales,* 42 Miss., 1; *Holman* v. *Bennett,* 44 Miss., 322.

In *Morgan* v. *Reading,* 3 Smed. & M., 366, where the Mississippi river was in question, it was held that by the common law and the law of Mississippi the owners of the soil on the banks of fresh-water rivers, whatever their magnitude, have the exclusive proprietary right therein to the middle of the stream,

subject only to the right of passage thereon as a highway, where the stream admits of it, and that the acts of congress making the river a common highway, and forever free to the citizens of the United States, gave an easement over the river only, and did not alter the rule of the common law as to the banks of the river or the rights of the owners of the soil therein.

It was held further that the banks of a stream not technically navigable are private property subject to the exclusive appropriation of the owner, and are not subject to the use of the public, although the river itself be a public highway, the use of which may not be interrupted, even by the owner. Whether the exclusive right of use by the owner of the soil extends beyond low water mark on the Mississippi river, the court left undecided.

In the *Steamboat Magnolia* v. *Marshall,* 39 Miss., 110, that question was decided. It was held that the Mississippi river is not, above tide water, a navigable stream in the technical sense of that term, and is in all respects subject to the rules of the common law regulating the rights of the public and of riparian proprietors in fresh-water streams capable of being navigated.

The authority of *Morgan* v. *Reading* and the *Steamboat Magnolia* v. *Marshall* was recognized in *N. O., M. & C. R. R. Co.* v. *Frederick,* 46 Miss., 9, 10, and the first case was cited in *Boom Co.* v. *Dixon,* 77 Miss., 593, as authority.

The law being thus established, Fritz claims he has title to the bed of Horn Lake, and the right to take fish from it as his private property, and that the state or the public has no interest in the land or the water, and no right to direct or control him in the use of either. The lake is not navigable in any sense. *Gaston* v. *Mace,* 33 W. Va., 14 (10 S. E. Rep., 60; 25 Am. St. Rep., 862); *Burke Co. Commissioners* v. *Catawba Land Co.,* 116 N. C., 731 (21 S. E. Rep., 941).

Chief Justice Sharkey, in his opinion in *Morgan* v. *Reading,* stated that the riparian owner owned the fish in nontidal rivers, or rivers not navigable, and that such right extended to the middle of the river, where he owned on one side, and referred

---

---

to *Adams* v. *Pease*, 2 Conn., 481; *Ingraham* v. *Wilkinson*, 4 Pick. (Mass.), 268; *Commonwealth* v. *Chapin*, 5 Pick., 199, as authority.

In determining Fritz's title to the soil of Horn Lake, and his right to take the fish from it, the court is not concerned with the question of the navigability in fast of the lake, or the right of floating in the public, or any adjacent proprietor or other portions of the lake. These rights have nothing to do with the title to the soil or the right to take the fish. They exist independently of each other.   1 Farnham on Waters & Water Rights, secs. 231 and 28g, p. 119; Gould on Waters, secs. 55m, 63, 110, and 196; *Magnolia* v. *Marshall*, 39 Miss., 110.

It has been frequently decided that the right to navigate a nontidal water does not include the right to take fish from such water, and that such right belongs to the owner of the soil under the water.   2 Farnham on Waters & Water Rights, sec. 368b, pp. 1364, 1365; *Smith* v. *Andrews Law Rep.*, 2 Chy., 693; *Leconfield* v. *Lonsdale, Law Rep.*, 5 Common Pleas., 665.

*William Williams*, and *R. L. Dabney, contra.*

Horn Lake has a pass into the Mississippi river, both in Tennessee and in Mississippi, through which fish can freely pass, and even steamboats in high water. As to whether this state of facts makes it a public water, see 13 Am. & Eng. Ency. Law (2d ed.), 568 *et seq.* Now if this is not a private pool, Fritz cannot take fish on his own land in violation of the game and fish laws. On this proposition, see the authority above cited and 14 Am. & Eng. Ency. Law (2d ed.), beginning on p. 661.

Do the ordinances under consideration, and the act of the legislature authorizing the board to pass them, violate that clause of both state and federal constitutions which forbids the taking of private property without due process of law ?

A complete answer to this question is found in the case of *Lawton* v. *State*, 152 U. S., 136.

The case of *Greer* v. *Connecticut*, 161 U. S., 519, is on the

constitutionality of a law prohibiting the shipping of game out of the state. And while our ordinance does not deal with this subject, the case goes so fully into the question of the right of the state to protect its fish and game that many parts of the opinion are in point, especially as the petition in this case charges that the interstate commerce law is violated by our ordinances.

Cox, J., delivered the opinion of the court.

Louis Fritz was arrested on a charge of violating an ordinance of the board of supervisors of DeSoto county which prohibited the catching of fish in any lake or stream in said county with any seine or net more than seventy-five feet in length or more than six feet in depth or that has smaller meshes than one inch. He sued out a writ of *habeas corpus,* and represented that he had been unlawfully deprived of his liberty, claiming that the ordinance under which he had been arrested was, for many reasons, unconstitutional and void. Upon the trial it appeared that he had caught fish in the manner prohibited by the ordinance in the waters of Horn Lake. Horn Lake is a considerable body of water, eight or ten miles in length and nearly a half mile-wide, lying partly in Tennessee and partly in DeSoto county, Mississippi. It has an outlet in Mississippi, through Mud Lake and a bayou, into the Mississippi river. It seems from the evidence that this outlet sometimes ceases to flow in time of drought, but it flows continuously during the rainy season, and in times of high water permits the passage of steamers into the lake. It was contended for relator below, and it is urged here, that, inasmuch as he owned the northern prong of Horn Lake, in Tennessee, and the northern shore of the southern prong, in Mississippi, and a considerable part of the southern shore, and owned the bed of a large part of the lake, and had secured from a number of the riparian owners in Mississippi the right to fish in their part of the lake, the fish in that part of the lake belonging to him, or in which he had secured

the right to fish, were his property; that he had the right to take them in any manner he might see fit; that the public had no interest in the fish in his waters, and that the state of Mississippi was without power to regulate or in any wise restrict or control him in the exercise of his dominion over them.

' We do not find it necessary to pass upon any of the several instruments or evidences of title by which he claims to establish his rights in Horn Lake, nor to determine to what extent, if any, he owns the bed of the lake. It is proper to state, however, in passing, that, conceding all he claims, it is not shown that he owns or has acquired the right to fish in the entire lake. It is perfectly clear that he does not own the fish in Horn Lake, and this would be true even if he owned the bed of the entire lake and all its waters. Fish are *ferae naturae.* They are incapable, until actually taken, of absolute ownership, except in artificial lakes or in small ponds that are entirely land locked. In all running streams, large lakes, small lakes with outlets into other waters, the right of the state to regulate the time, the manner, and extent of the taking of fish is unquestioned. It is part of the police powers of the state, which has never been parted with and cannot be surrendered. By reason of the migratory habits of fish, their ownership is in the public, and no individual has any absolute property right in them until they have been subjected to his control. It is not only the right of the state, but also its duty, to preserve for the benefit of the general pubilc the fish in its waters, in their migrations and in their breeding places, from destruction or undue reduction in numbers through the caprice, improvidence, or greed of the riparian proprietors as well as of trespassers. *People* v. *Collison,* 85 Mich., 105 (48 N. W., 292; *West Point Water Power & Land Improvement Co.* v. *State,* 49 Neb., 218 (66 N. W., 6) ; *Weller* v. *Snover,* 42 N. J. Law, 341; *People* v. *Reed,* 47 Barb. (N. Y.), 235; *People* v. *Doxtater,* 75 Hun. (N. Y.), 472 (27 N. Y. Supp., 481) ; *State* v. *Blount,* 85 Mo., 543; *Gentile* v. *State,* 29 Ind., 409 ; *State* v. *Roberts,* 59 N. H., 484; *People* v. *Bridges,* 142

Ill., 30 (31 N. H., 115; 16 L. R. A., 684); *Peters* v. *State,*
taking of the fish in Horn Lake was that he might ship them
96 Tenn., 682 (36 S. W., 399; 33 L. R. A., 114); *Lawton* v.
*Steele,* 152 U. S., 133 (14 Sup. Ct., 499; 38 L. ed., 385);
*Organ* v. *State,* 56 Ark., 270 (19 S. W., 840); *Ex parte Maier,*
103 Cal., 476 (37 Pac., 402; 42 Am. St. Rep., 129); *State*
v. *Rodman,* 58 Minn., 393 (59 N. W., 1098).

Citation of authorities in support of the general position
maintained in this opinion could be multiplied indefinitely.
Indeed, we know of no well-considered case anywhere which
denies or materially qualifies it.   It is held with practical
unanimity in all jurisdictions that animals *ferae naturae* are
not the subject of private ownership until reduced to actual
possession; that the ownership of such animals, so far as they
are capable of ownership, is in the state, not as proprietor, but
in its sovereign capacity, as the representative and for the
benefit of all its people in common; and that the state may
regulate and restrict the taking of such animals, or absolutely
prohibit it, if deemed necessary for their preservation or for
the public good.   This being true, it follows that animals
*ferae naturae,* not reduced to actual possession, are not property,
within the contemplation of secs. 14 and 17 of the constitution
of this state, nor of art. 14 of the constitution of the United
States, and that statutes regulating and restricting their cap-
ture do not operate a taking of property without just compen-
sation nor a depriving of property without due process of law.

The relator contends that inasmuch as his purpose in the
taking of the fish in Horn Lake was that he might ship them
to Memphis, in the state of Tennessee, to be there sold, any
statute or ordinance restricting him in respect to the extent to
which he might take them would be an interference with inter-
state commerce, and therefore void.   The contention is without
merit.   The supreme court of the United States has held in a
number of cases that the grant to congress of the power to
regulate interstate commerce does not carry with it any right

to regulate the production of commodities, even though the purpose of their production be their sale beyond the limits of the state wherein they are produced. The control of the state, in the exercise of its police powers, over the production of the articles of commerce, is as absolute and unqualified as the control of Congress over their interstate distribution. *Kidd* v. *Pearson,* 128 U. S., 1 (9 Sup. Ct., 6; 32 L. ed., 346) ; *United States* v. *E. C. Knight Co.,* 156 U. S., 1 (15 Sup. Ct., 249; 39 L. ed., 325). In recognition of this general doctrine, and especially of the police power of the state for the preservation of game, the supreme court of the United States has upheld a state statute which made it an offense to have in possession, for the purpose of transportation beyond the state, birds which had been lawfully killed within the state during the open season. As an original proposition, we would have hesitated to go so far in upholding the power of the state as against the control of congress over interstate commerce; and it is worthy of remark that the supreme court, in so holding, overruled and disregarded the opinion to the contrary of the supreme courts of Kansas and Idaho, saying: "It is, indeed, true that in *State* v. *Saunders,* 19 Kan., 127 (27 Am. St. Rep., 98), and *Territory* v. *Evans,* 2 Idaho, 634 (Hasb., 658; 23 Pac., 115; 7 L. R. A., 288), it was held that a state law prohibiting the shipment outside of the state of game killed therein violated the interstate commerce clause of the constitution of the United States; but the reasoning which controlled the decision of these cases is, we think, inconclusive, from the fact that it did not consider the fundamental distinction between the qualified ownership in game and the perfect nature of ownership in other property, and thus overlooked the authority of the state over property in game killed within its confines, and the consequent power of the state to follow such property, into whatever hands it might pass, with the conditions and restrictions deemed necessary for the public interest. Aside from the authority of the state, derived from the common ownership of game, and

the trust for the benefit of its people which the state exercised in relation thereto, there is another view of the power of the state in regard to property in game which is equally conclusive. The right to preserve game flows from the undoubted existence in the state of a police power to that end, which may be none the less effectively called into play because by doing so interstate commerce may be remotely and indirectly affected. Indeed, the source of the police power as to game birds (like those covered by the statute here called in question) flows from the duty of the state to preserve for its people a valuable food supply. The exercise by the state of such power therefore comes directly within the principle of *Plumley* v. *Massachusetts*, 155 U. S., 461–473 (15 Sup. Ct., 154; 39 L. ed., 223). The power of the state to protect by adequate police regulation its people against the adulteration of articles of food (which was in that case maintained), although in doing so commerce might be remotely affected, necessarily carried with it the existence of a like power to preserve a food supply which belongs in common to all the people of the state, which can only become the subject of ownership in a qualified way, and which can never be the object of commerce except with the consent of the state, and subject to the conditions which it may deem best to impose for the public good." *Geer* v. *State of Connecticut,* 161 U. S., 519 (16 Sup. Ct., 600; 40 L. ed., 793). We have quoted at some length from the opinion in the above case, because it goes to the greatest extreme in upholding the power of the state over game, and establishes beyond all controversy or cavil the right of the state to do whatever it may deem advisable to preserve for its people this source of food supply. The same reasoning applies with equal force to fish, and leaves nothing more to be said with reference to the power of the state to legislate for their preservation.

It is earnestly insisted that, conceding to the state power to regulate the taking of fish, it cannot delegate this power to the boards of supervisors of the several counties. In support of

this contention it is urged that inasmuch as the powers of government are, under our system, divided into three distinct departments, and each of them confined to a separate magistracy —to wit, those which are legislative to one, those which are judicial to another, and those which are executive to another— and inasmuch as the legislative power has been vested in the legislature, and inasmuch as the board of supervisors forms a part of the judicial department of the government, as shown by its being treated in art. 6, together with the other courts, under the title "Judiciary," the giving to the boards of supervisors of power to regulate the taking of fish would violate these fundamental principles of our system and tend to confound the functions of the several magistracies by imparting to one, wholly judicial, powers in their nature essentially legislative, and exclusively vested in the state legislature. The answer to this argument is that the board of supervisors is not within the scope and operation of the principles invoked. It is not, strictly speaking, a judicial body. Its jurisdiction is now, and has always been, mixed, being in part legislative, in part judicial, and in part executive. It exercised this mixed jurisdiction under the constitution of 1869, and, with its jurisdiction unimpaired, was continued, by the constitution of 1890, as the chief agency for the management of the police, fiscal, and civil affairs of the several counties. Comparatively only a small part of its jurisdiction is conferred directly by the constitution. The mass of its powers is conferred by legislative grant, under authority therefor conferred by the constitution. Under the constitution of 1869, and also of 1890, the board of supervisors has performed many duties which are essentially legislative in their nature—as, the levying of taxes; the support of schools; the making of regulations for the depasturing of cattle and the cultivation of crops without fences; the establishment of quarantines and regulations of hygiene; the inspection of articles of food; the drainage of swamp lands;

the licensing or prohibition of the liquor traffic; the working of convicts on county farms; the regulation of the taking of oysters, fish, and game; and many others. Power to do none of these things is conferred in express terms directly by the constitution. Power to do them all has been delegated by the legislature in pursuance of the power given to prescribe other duties than those named in the constitution to be performed by the board of supervisors. Having been delegated by the legislature under constitutional warrant, they have become as much a part of the jurisdiction of the board of supervisors as if the power to do them had been expressly and specifically conferred by the constitution itself. To hold otherwise would be to rob the board of supervisors of the great mass of its jurisdiction and practically destroy its usefulness, as well as render nugatory the implied grant by the constitution to the legislature of power to impose upon it duties not prescribed in the constitution. Legislation imposing duties of a similar kind upon the board of supervisors has been heretofore upheld by this court, and we see no reason now for departing from long-recognized principles, and thereby subverting a public policy which gives so large a measure of local self-government to the several counties of the state, and whose wisdom has been so fully vindicated in the beneficent results which have attended its operation. *Barataria Canning Co.* v. *Ott,* 84 Miss., 737 (s.c., 37 South. Rep., 121; *Ormond* v. *White,* 85 Miss., 276 (s.c., 37 South. Rep., 834).

Relator's contention that the ordinance under which he was arrested is obnoxious to the inhibitions of our constitution against special legislation cannot be upheld. The ordinance is general in its terms, applying to all the lakes and streams in DeSoto county, and was adopted in pursuance of authority conferred by a general act of the legislature.

It appears that relator was held under a capias issued by B. F. Jones, mayor of Hernando, and *ex officio* justice of the peace, and it is conceded that the offense charged was not com-

mitted within the territorial limits of his jurisdiction. Relator cannot be held under this capias. So much of Code 1892, § 2128, as commits the judicial administration of the game laws to mayors and justices of the peace, whether the act be done in their respective districts or not, is unconstitutional and void. *Riley* v. *Jones,* 73 Miss., 1 (18 South. Rep., 930), and cases there cited. But the said section makes the breach of any regulations, order, or resolutions of the board of supervisors touching fish and game a misdemeanor; and any person guilty of such misdemeanor may, of course, be proceeded against before any justice having local jurisdiction. Upon this one point alone the learned judge who heard relator's petition was in error.

*Reversed, relator discharged, and proceedings quashed.*