STATE GAME AND FISH COMMISSION *v.* LOUIS FRITZ CO.

(In Banc. Jan. 15, 1940.)

[193 So. 9. No. 33712.]

**W. W. Pierce,** Assistant Attorney-General, for appellant.

Herbert Holmes, of Senatobia, and Frazer & Clifton, of Memphis, Tenn., for appellee.

556

Argued orally by **W. W. Pierce**, for appellant, and by **C. E. Clifton**, for appellee.

**Griffith, J.,** delivered an opinion.

The initial contention of appellee that it owns the soil or bed of the lake opposite its riparian lands and to the center or middle of the lake is well taken, and is established as correct by Richardson v. Sims, 118 Miss. 728, 80 So. 4. It owns the minerals thereunder, Archer v. Levee Com'rs, 158 Miss. 57, 130 So. 55; Archer v. Greenville Sand & Gravel Co., 233 U. S. 60, 34 S. Ct. 567, 58 L. Ed. 850, and by the same reason anything which becomes in the process of nature permanently attached thereto. Wineman v. Withers, 143 Miss. 537, 108 So. 708.

But appellee, as riparian owner and as owner of the bed of the lake opposite its riparian lands, is not the owner of the water resting for the time being upon its submerged lands or lake bed. 27 R. C. L., pp. 1070, 1071. In its ordinary or natural state, water is neither land, nor tenement, nor susceptible of absolute ownership. It is a movable, wandering thing and admits only of a transient, usufructuary property. 67 C. J., p. 675. The Magnolia v. Marshall, 39 Miss. 109, 124. The riparian owner may not say that he has any sole ownership in that part of the water which rests upon his lake bed, for the unity of a lake is preserved not only by all parts of its entire bottom but also by all its banks, as to which other riparian owners contribute an essential part to the maintenance of the whole; so that without the entire presence of the entire boundaries of the banks there would be no lake at all.

And appellee as riparian owner does not own any of the fish in the lake. This was settled in Ex parte Louis Fritz, 86 Miss. 210, 38 So. 722, 723, 109 Am. St. Rep. 700, wherein it was said ''fish are feræ naturæ. They are

incapable, until actually taken, of absolute ownership, except in artificial lakes or in small ponds that are entirely land locked." And the Court said that since the fish in such a lake are not the subject of private ownership until reduced to actual possession, their ownership in the meantime so far as capable of ownership is in the state, not as proprietor, but in its sovereign capacity, as the representative, and for the benefit, of all its people in common.

Inasmuch as there is no private ownership in the water or in the fish it follows that where, as here, there are several riparian owners of an inland lake, each owner, their licensees, and every other inhabitant who can gain access thereto without trespass, may use the surface of the whole lake for boating and fishing so far and so long as they do not interfere with the reasonable like use by others similarly entitled to that right. 26 C. J., pp. 599, 603; Beach v. Hayner, 207 Mich. 93, 173 N. W. 487, 5 A. L. R. 1052; Percy Summer Club v. Astle, 1 Cir., 163 F. 1. The foregoing statement of the rule is supported not only by reason and by respectable authority on the point, but is in accordance with what has been the generally observed custom and rule of conduct among the people in this state for time out of mind—an acquired custom or usage which is within the limits of the further reasons which we shall later point out.

What has been said in the foregoing paragraph has reference to the rule in this state, and to the immemorial usages, customs, and practices of our people, as regards boating and fishing in the usual and ordinary modes and manners for sport, pleasure and recreation; and the rule will include the right in those named to boat and fish for commercial purposes so long as conducted in a small way by the use of boats not too large to be freely capable of being propelled by oars, even though not so propelled, and when the fishing is done solely by the traditional and ancient means of the pole and line, or the rod and reel, or with small nets and the like which do

not disturb the bottom, or the upland, or anything permanently belonging to the upland or the bottom.

By the uses aforesaid there is no appreciable burden placed upon the bottoms of the riparian owner; there is no interference with his free access to and from his riparian lands; there is no presence of the noise and clamor of workmen; no disturbance of his bottoms or his banks; and if a small boat should occasionally drop its insignificant anchor or the hook or line should sometimes reach the bottom, this would be a trifle too small for the law to notice—de minimis non curat lex.

But a different question is presented when the fishing is for commercial purposes on a comparatively large scale, and by the use of the means and implements beyond those heretofore herein mentioned—keeping in mind all the while that we are here concerned with nontidal waters only. As to such waters and as to those larger operations therein for commercial purposes, there are apparent reasons why, and the fact is that, there has been no such immemorial, uniform and general statewide customs and usages in this state as would work a modification of the ancient common law as inherited by us from the mother country; and thus the rule in regard to the right of commercial fishery, when conducted on the larger scale as mentioned in this paragraph, is that of the ancestral common law, which is, that this right belongs exclusively to the riparian owner and is co-extensive with the boundaries of his soil under the bed of the lake, this right to be exercised at the same time in such manner as not unreasonably to interfere with or exclude those who are mentioned in previous paragraphs herein. Hardin v. Jordan, 140 U. S. 371, 11 S. Ct. 808, 35 L. Ed. 428, 435; Notes 3 Ann. Cas., p. 860; 3 Kent's Commentaries (13th Ed.), p. 579, original Sec. 418, and see the cases collected in Gratz v. McKee, 8 Cir., 270 F. 713, at page 718, 23 A. L. R., 1393.

All the foregoing rights are subject, however, to the superior authority of the State in its governmental ca-

pacity to regulate the time, manner and the extent to which the fish may be taken. And, as said in Ex parte Louis Fritz, supra: ''It is not only the right of the state, but also its duty, to preserve for the benefit of the general public the fish in its waters, in their migrations and in their breeding places, from destruction or undue reduction in numbers through the caprice, improvidence, or greed of the riparian proprietors as well as of trespassers.'' And the Court said that the State may not only regulate and restrict the taking, but may absolutely prohibit it, if deemed necessary for the preservation of the fish or for the public good. But this must be for real reason, and not as purely arbitrary action.

Thus it follows that the State has the power, under adequate statutory enactment, as well as the reasonable duty, to take all necessary or proper steps for the extermination of all species of predatory fish, and having that power may avail of any and every reasonable means or agency for the accomplishment of that purpose, so long as the state maintains control and supervision of the means and agencies put at work. 11 R. C. L., p. 1041, and cases cited under note 20. But inasmuch as the State does not own the fish as proprietor or absolute owner (Ex parte Louis Fritz, supra), it has no right to take the fish and sell them solely, and for no other purpose than, as a proprietary business of the state; nor may it conduct its conservation or preservation operations in such manner or to such an extent as unreasonably or unnecessarily to intrude upon or invade the stated right of fishery of the riparian owner.

And inasmuch as the State has the dominant right of regulation, preservation, and conservation aforementioned, it would have the right in the pursuit of reasonable and proper means to that end and as an incident thereof to gain access to the waters by ingress over the lands of a riparian owner, and temporarily to tie or moor its equipment to the banks, or to the trees there standing or standing in the water, so long as no substantial injury

is thereby done to the property of the riparian owner, or could anchor the equipment to the bottoms of the lake or allow any part of its equipment to rest upon the bottoms, so long as all this is temporarily done, and only to the extent and for the sufficient time necessary for the proper performance of the work.

As to the common law, as stated in the foregoing paragraphs, it is my understanding that the majority of the members of the Court are in substantial agreement, and are agreed also that the legislature by a sufficiently explicit enactment may exercise the powers mentioned. The difference of opinion has arisen over what the legislature has done, rather than upon what it may do. In my judgment everything done herein, by the State Game and Fish Commission, and by its contractor acting under it, insofar as anything to the contrary is disclosed by the present record, was fully authorized by Chapter 123, Laws 1932, and that the decree should be reversed not only, but that the bill should be dismissed.

**McGehee, J.**, concurs in the foregoing opinion, and as to the common law **McGowen** and **Anderson, JJ.**, also concur; but as regards the statute, Chapter 123, Laws 1932, and its effect, **McGowen** and **Anderson, JJ.**, concur in the opinion of **Smith, C. J.**

**Smith, C. J.**, delivered an opinion.

I am of the opinion that the court below was correct in holding that Chapter 123, Laws 1932, does not confer on the State Game and Fish Commission authority to remove gross non-game fish from lakes and streams. No section of the statute expressly confers such authority, and no such authority can be inferred from any section when construed either separately, in connection with others, or with the purpose for the accomplishment of which the statute was enacted. We have no occasion, therefore, to determined what authority, in this connection, the

State through its legislature could have constitutionally granted the State Game and Fish Commission, nor have we any occasion to hold that Commission or its members accountable for unlawful acts committed by it, if any, except in so far as injury was thereby inflicted on the appellee. There being no governing statute, what rights of the appellee, if any, that here were invaded by the appellant must be determined by the common law.

The appellee owns that portion of the bed of the lake to the center thereof, lying opposite the shore of the lake owned by it, and where it owns the shore on opposite sides of the land, it owns the entire intervening bed of the lake. This is well established by former decisions of this Court. It does not own the water above its land nor the fish that may be therein. "Fish are feræ naturæ. They are incapable, until actually taken, of absolute ownership, except in artificial lakes or in small ponds that are entirely land locked. . . . It is held with practical unanimity in all jurisdictions that animals feræ naturæ are not the subject of private ownership until reduced to actual possession; that the ownership of such animals, so far as they are capable of ownership, is in the state, not as proprietor, but in its sovereign capacity, as the representative and for the benefit of all its people in common." Ex parte Louis Fritz, 86 Miss. 210, 38 So. 722, 723, 109 Am. St. Rep. 700; State v. Buckingham, 93 Miss. 846, 47 So. 501; State v. Hill, 98 Miss. 142, 53 So. 411, 31 L. R. A. (N. S.) 490. It follows from this, and was so held in State v. Buckingham, supra, that all of the people have an equal right to take and appropriate fish in their wild state. This right is necessarily affected and qualified by the fact that, in taking fish, one must not trespass on the land of another.

The Carrigans, employees of the appellee, obtained access to the lake over the land of a riparian owner with his consent. Did that fact give them the right to take fish from that part of the like which was over the appellee's submerged land?

The existence of this lake is made possible by the fact that its waters are supported and confined by the land belonging to the several riparian owners. Without this support and confinement of its waters, there would be no lake for any riparian owner to fish in. While there is authority to the contrary, there is respectable authority, with which I concur, holding that each of several riparian owners, is licensees, and members of the general public who can gain access thereto without committing a trespass in so doing, may use the entire surface of the lake for fishing so far as he does not interfere with a similar reasonable use thereof by others, except such fishing as requires the use of the shore or bottom of the lake, the right to which is in the owner of the shore or bottom. 22 Am. Jur., Fish & Fisheries, Sec. 21; 26 C. J. 599; Beach v. Hayner, 207 Mich. 93, 173 N. W. 487, 5 A L. R. 1052.

The Carrigan Company being licensed by a riparian owner so to do committed no trespass in gaining access to the lake; consequently it had the right to take and appropriate fish therefrom but did not have the right to make use of the appellee's portion of the shore and submerged land of the lake in so doing.

It follows from the foregoing views that I concur in holding that the judgment against the State Game and Fish Commission for the value of the fish taken by Carrigan Company, its employee, should be reversed and the bill dismissed in so far as it prays therefor, but that the injunction granted should be modified and limited to restraining the State Game and Fish Commission, its members, and employees from using appellee's portion of the shore and submerged land of the lake for fishing purposes.

It may be that the legislature has not authorized the Fish and Game Commission to be sued; but, as to that, I express no opinion as we have no occasion to consider it.

**Ethridge, J.,** delivered an opinion.

I am of the opinion that the judgment of the court below should be reversed and the bill dismissed, because in my opinion what was done in this case was authorized by law;.and that Louis Fritz & Company, complainants in the court below, appellees here, had no right in the fish captured and sold under the arrangement made by the State Game and Fish Commission, in its effort to protect the game fish in South Horn Lake, or Lake View, in waters over the land of the complainant, Louis Fritz & Company.

Chapter 123, Laws of 1932, is quite comprehensive, and it would be difficult to set forth the many provisions bearing upon the controversy here involved. A careful reading of the whole act, I think, shows power to do all that was done. Under its police power the state and its agents may go upon any stream or lake to exercise such powers. The riparian owner takes his title subject to this easement of the state. The state can exercise its trust in behalf of all people in no other way. The right of the riparian owner is subject to an easement of the state to assert its power to use the channel in the exercise of its own rights. Steamer Magnolia v. Marshall, 39 Miss. 109; Richardson v. Sims, 118 Miss. 728, 80 So. 4.

In section 4 of the act the Commission is given power to make rules and regulations, to inaugurate studies and surveys, and to "'establish such services as they may deem necessary to carry out the provisions and purposes of this Act, and any violation of any of the provisions of this Act or of any rules or regulations promulgated by the Commission shall constitute a misdemeanor.''

It is further given authority:

''(a) To close or shorten the open season as prescribed by law in cases of urgent emergency on any species of gamebirds, game or fur-bearing animals, or fish, in any specified locality or localities, when it shall find after investigation and public hearing, that such action is rea-

sonably necessary to secure the perpetuation of any species of game birds, game or fur-bearing animals, or fish and the maintenance of an adequate supply thereof. The statutes governing such subjects shall continue in full force and effect, except as further restricted and limited by the rules and regulations promulgated by the Commission.

"(b) To designate, with the consent of the owner or owners, such localities as it shall find necessary to secure perpetuation of any species of game bird, fur animal, or fish and the maintenance of an adequate supply thereof, as game, bird, fur animal, or fish refugees for the purpose of providing safe retreats in which game, birds, fur animals, or fish may rest and replenish adjacent hunting, trapping or fishing grounds or waters.

. . . . . .

"(e) To capture, propagate, transport, sell or exchange any species of game birds, game or fur-bearing animals, or fish needed for stocking or restocking any lands or waters of the State.

"(f) To enter into cooperative agreements with persons, firms, or corporations or governmental agencies for purposes consistent with the purpose of this act.

. . . . . .

"(i) To have exclusive charge and control of the propagation and distribution of wild birds, animals and fish; the conduct and control of hatcheries, biological stations and game and fur farms owned or hereafter acquired by the State; to expend for the protection, propagation or preservation of game birds, game or fur bearing animals and fish all funds of the State acquired for this purpose arising from licenses, gifts, or otherwise and shall have charge of the enforcement of all the provisions of this Act.

. . . . . .

"(k) To regulate the taking of non-game gross fish, and prescribe the manner of taking same."

It is provided that this section shall not apply to or affect any contract theretofore entered into by any board of supervisors of any county for the taking of non-game gross fish. The Commission is also given authority to cooperate with the several departments and officers in the conduct of matters in which the interests of the respective departments or officials overlap.

In section 8 of the act the Commission is given power to dispose of contraband animals, birds and fish. In section 11 the State Director is given power to appoint wardens with the approval of the Commission. By section 16 it is provided that the Director of Conservation shall have general supervision and control of all wardens, and under the supervision of the Commission, "shall enforce all the provisions of the laws and regulations of the State relating to wild animals, birds and fish, and shall exercise all necessary powers incident thereto not specifically concerned on the Commission."

It is also provided in the section that the State Director of Conservation and each of the wardens "shall have power, and it shall be the duty of said Director and of each of such warden to execute all warrants and search warrants for a violation of the laws and regulations relating to wild animals, birds and fish; to serve subpoenas issued for the examination and investigation or trial of offenses against any of the provisions of such law or regulations; to make search where such warden has cause to believe and does believe that animals, birds or fish, or any parts thereof, or the nest or eggs of birds, or spawn of eggs of fish are possessed in violation of law or regulation, and in such case to examine, without warrant, the contents of any boat, car, automobile, or other vehicle, box, locker basket, creel, crate, game bag, or other package, to ascertain whether any of the provisions of this Act or any law or regulation for the protection of animals, birds or fish have been or are being violated," etc.

By section 22 of the act a State Game and Fish Fund is created, and required to be paid into the State Game and Fish Protection Fund, to be used by the Commission and the State Director of Conservation, for the purpose of carrying out the provisions of this act, etc.

By section 27 of the act the game animals, birds and fish are named, and closed and open seasons are provided for, stating the time when birds, animals or fish may be lawfully taken; and hunting and fishing licenses are provided for in the act.

Under section 61, it is unlawful to kill or take fish of the bass family under eight inches in length, or of the sunfish family under four inches in length.

By section 62 it is made the duty of every person to return to the water any game fish taken out of reason, or those caught under legal size, by means of nets, seines or other contrivances used for the taking of fish not classified as game fish.

By section 63 it is provided that it shall be unlawful for any person to sell, offer for sale or exchange any game fish enumerated in the act, whether taken within, or coming from without the state. Providing, however, that the Commission may issue a permit to the owner of a private pond to sell fish grown or cultivated by such owner under such regulations as the Commission may deem wise.

By section 64 it is provided that a non-resident fishing license shall be issued to non-residents of the state upon application in the same manner and by the same authorities mentioned for issuance of hunting licenses, upon payment of a named fee. These and many other provisions of the act vest large power and discretion in the authorities.

There are many other provisions of the act which do not apply to fish, and are unnecessary to set forth in this case. It will be seen from the provisions set forth that it was the purpose of the legislature to vest in the Game and Fish Commission, and the officers named, compre-

hensive powers for the regulation and protection, propagation and conservatism, of fish and game, for the benefit of all the inhabitants of the state.

The act here involved is the contract by the Game and Fish authorities named therein, with certain persons to destroy predatory fish and water animals, such as turtles, etc., so as to preserve the edible fish for the benefit of the public. The contract gave the parties contracted with the right to sell certain non-game gross fish, and in my judgment they were authorized to do so.

Under the terms of section 4, among other powers they are authorized to establish such services as they may deem necessary to carry out the provisions of the act. The service here established under the contract comes clearly within the granting power. If fish are to be conserved, preserved and propagated as a food supply for the inhabitants of the state, such fish and animals as prey upon and destroy them must be gotten rid of, and the service in so doing comes clearly within the act. The Commission generally has power to regulate and provide conditions under which it may act, and for the carrying out of the service provided for the taking of certain gross non-game fish in seines and nets, and these may be given as compensation to the parties undertaking to destroy predatory fish, animals, etc.

There could be no dispute about the power of the Commission to destroy these predatory animals, and for that purpose to expend part of the game and fish fund. Consequently, incident to securing the services contracted for, the Game and Fish Commission may give as part or the entire compensation for the work of taking them, such non-game gross fish, prescribing the manner of taking them, as set forth in clause (k) of section 4 of the act.

In Ex parte Fritz, 86 Miss. 210, 38 So. 722, 723, 109 Am. St. Rep. 700, it was held that fish, being feræ naturæ, were not the property of any person until subjected to his control; that until so reduced to possession by some person the title thereto is in the state. In the

course of the opinion the Court said: "It is proper to state, however, in passing, that, conceding all the claims, it is not shown that he owns or has acquired the right to fish in the entire lake. It is perfectly clear that he does not own the fish in Horn Lake, and this would be true even if he owned the bed of the entire lake and all its waters. Fish are feræ naturæ. They are incapable, until actually taken, of absolute ownership, except in artificial lakes or in small ponds that are entirely land locked. In all running streams, large lakes, small lakes with outlets into other waters, the right of the state to regulate the time, the manner, and extent of the taking of fish is unquestioned. It is part of the police powers of the state, which has never been parted with, and cannot be surrendered. By reason of the migratory habits of fish, their ownership is in the public, and no individual has any absolute property right in them until they have been objected to his control. It is not only the right of the state, but also its duty, to preserve for the benefit of the general public the fish in its waters, in their migrations and in their breeding places, from destruction or undue reduction in numbers through the caprice, improvidence, or greed of the riparian proprietors as well as of trespassers."

It will be seen from this case that until reduced to actual possession, all property rights in fish exist in the state for the benefit of the whole people. In the latter case of State v. Buckingham, 93 Miss. 846, 47 So. 501, 502, in the opinion rendered by Judge Calhoon it is declared: "It is now settled that the sovereignty is the owner of wild game, on the idea that animals, birds, and fishes, wild by nature, may be preserved as a food supply for all the inhabitants. It is settled that the sovereignty may have closed seasons, in which the destruction of all [wild fish and game] may be actually forbidden, and it may delegate this power to the several boards of supervisors of the various counties."

In the case last referred to the statute expressly permitted landowners to hunt upon their own lands in season, not prohibited, and may permit non-resident relatives or friends to hunt with them.

Again, in State v. Jim Hill, 98 Miss. 142, 53 So. 411, 31 L. R. A. (N. S.) 490, it was held that the state is the owner of all wild game, such as animals, birds and fish, within its borders; and that section 2305 of the Code of 1906 conferred on the board of supervisors full jurisdiction and authority to protect and preserve all game and fish in their respective counties, and to conserve the same for the use and consumption of the inhabitants, and that the word "inhabitants" applied to the inhabitants of the entire state. In that case it was held that the action of the board of supervisors under section 2305, Code 1906, limiting the taking of fish in the streams of the county to the inhabitants of the county, violated section 2 of the Fourteenth Amendment to the Constitution of the United States, U. S. C. A.

In the case of Keel et al. v. Harrison County Supervisors, 126 Miss. 195, 88 So. 625, it was held that under the Code of 1906, section 2304, section 4699 of Hemingway's Code, conferring upon the boards of supervisors full authority for the protection and preservation of fresh-water fish in their respective counties, such boards may prohibit the use of nets and seines, etc., for the catching of fish in any of the waters of their respective counties, although such waters may be inhabited by sea fish as well as by fresh-water fish. In the Court's opinion in that case, at page 201 of 126 Miss., at page 625 of 88 So., it is said: "It is true that under section 2304, Code of 1906, section 4699, Hemingway's Code, the jurisdiction given boards of supervisors over fish in their respective counties includes only fresh-water fish; nevertheless they are given by the following section of the Code full 'authority for the protection and preservation of game and fish in their respective counties,' which, ex vi termini, includes the power to do whatever is nec-

essary for their protection and preservation.'' This decision follows the well-known rule of constitutional and statutory construction that whenever a power is given, either by constitution or by statute, there is given with it, by necessary implication, the right and power to exercise such powers as are necessary to the carrying out of the power expressly granted.

Another interesting case upon the subject here involved is Barataria Canning Co. v. Jos. Ott et al., 84 Miss. 737, 37 So. 121, where it was held that under the Revised Code of 1880, section 956, granting boards of supervisors of the counties bordering on the Gulf of Mexico jurisdiction in the matter of the protection and preservation of oysters growing and being grown within the limits of their respective counties and with power to grant private rights of property in oysters banked, planted or cultivated in the waters of the county, is constitutional, and a private right to bank, plant and cultivate oysters in the waters of the sea, within the limits of the county, acquired from the board of supervisors under said statute, is valid. It was also held in this case that in the absence of an express statute the owners of land bounded by the sea possess no exclusive right to the soil under the water beyond high water mark, and they have no greater right than others of fishing and gathering oysters from natural beds in front of their property

This case is peculiarly interesting because of the fact that without the statute referred to all of the inhabitants had equal rights in regard to bedding, fishing, gathering and canning oysters in the waters of the sound; but the state had a right to confer upon particular persons for a specified period of time, exclusive authority to exercise such right and use.

There is some difference, of course, in the rights of owners whose property abuts on the tide waters, and those on streams which do not abut on such tide waters. But the case is interesting from the fact that it was held to be within the power of the legislature to grant to

particular persons or concerns exclusive right to such waters. The rights of all the inhabitants of the state are equal as regards the fish and game of the state. Fish and game, as well as the waters which they usually inhabit, are migratory—moving from one place to another; and the owner of the land owns neither the water which flows past, nor the fish therein, nor the migratory birds which go upon his land, until he has actually taken possession of them.

It was argued at the bar that a person going upon the land of another without his consent is a trespasser, and that any game or fish taken by a trespasser becomes the property of the owner of the land whereon they were taken. This is not correct, for the reason that every person has an equal right to take game and fish; and while a trespasser can be punished for trespassing, he is not deprived of the possession of his game which he has taken, unless the law, by competent statute, provides that they should be forfeited as a penalty for trespassing, or as accompanying the trespass.

A negro may be a trespasser upon the land of his land-lord, in which case the landlord can prosecute him; but his rabbit or other game may not be taken from him, because when he took possession of it, it was not the property of the landlord.

By clause (e) of section 4, set out above, the Game Commission has authority "To capture, propagate, transport, sell or exchange any species of game birds, game or fur-bearing animals, or fish needed for stocking or restocking any lands or waters of the State."

By a provision of clause (a) of section 4, set out above, it is provided that "The statutes governing such subjects shall continue in full force and effect, except as further restricted and limited by the rules and regulations promulgated by the Commission."

Therefore, construing the provisions of this act, in the light of previously existing laws, the proprietary interest of the state remains, and its powers of supervision

thereof were validly delegated to the Commission, and the other officers provided for in chapter 123, Laws of 1932.

Under clause (i) of said section 4 of said chapter the Commission has exclusive charge and control of the propagation and distribution of wild birds, animals and fish; the conduct and control of hatcheries, biological stations and game and fur farms owned or hereafter acquired by the state; to expend for the protection, propagation or preservation of game birds, game or fur-bearing animals and fish all funds of the state acquired for this purpose arising from licenses, gifts, or otherwise and shall have charge of the enforcement of all the provisions of the act.

By clause (f) the state has the power to enter into cooperative agreements with persons, firms or corporations or governmental agencies for purposes consistent with the purpose of this act. The agreement here involved is such an agreement as is embraced in and contemplated by this clause of section 4. The state being the owner of such title as exists in animals, birds or fish within the state, and being charged with the duty of capturing, propagating, selling or exchanging any species, it has, as a consequence, the right to make all contracts appropriate or necessary to carrying out the granted power. The very fact of acting to conserve and propagate carries with it the power to protect the fish, birds and animals by any appropriate means. This is a part of the police power of the state, which it was said, in Ex parte Fritz, could not be surrendered by the state; the power to govern such matters in the interest of the people. In the exercise of its police powers the state may go upon any lands, to gain access to streams and places where such game birds, animals or fish exist, in order to see that they are not destroyed either by persons or by predatory fish, birds or animals. Owners of riparian lands have only such rights as are consistent with the free and full exercise of the powers of the state; other-

wise, how could the state, or its agents, preserve the game animals, birds or fish?

The common law of England does not prevail in this state in such matters. In the case of cattle running at large it was held that the law of England, requiring the owner of cattle to confine them to his own lands, did not prevail here, because not applicable to our conditions; and that consequently the cattle which strayed upon the lands of another were not trespassing. It has been the custom from the beginning in this state, so long that the memory of man runneth not to the contrary, that a person may go upon the wild lands of another, unless such lands be posted in the manner prescribed by law, or unless expressly notified and warned not to do so. It required a statute to change the law with regard to cattle; but the law with reference to hunting and fishing, even as to individuals, has not been changed, except as provided in the chapter above discussed.

The state itself is the owner of running water within its borders, and of the fish therein until they are captured; and of the game animals and birds, until they are reduced to possession; and incident to this ownership is the right to inspect, police and protect it. The rights of land owners in respect to these matters is limited—they cannot exercise unlimited ownership either above or below the surface of the land. How could supervision or transportation be carried on if the parties authorized to perform these acts were subject to prosecution for trespass? It is important here to stress this police power connected with the state's ownership of the fish and game of the state in trust for the people of the state. Taking the statute as a whole, with the common law as it exists in this state, as declared in the above decisions, it seems clear that the state has a right to make it possession and ownership of fish and game absolute, and to prohibit the taking by private persons at all. Such seems to be within the legislative power; and it seems to me this is expressly held to be within the pow-

er of the government in the case of Barataria Canning Co. v. Ott, 84 Miss. 737, 37 So. 121, supra.

I am therefore convinced that the judgment of the court below was erroneous, and that it should be reversed, and judgment rendered here dismissing the bill.